STEPHEN P. KOESTER, Appellant, v STATE OF NEW YORK, Respondent.

Fourth Department, December 17, 1982

### APPEARANCES OF COUNSEL

*Sargent, Sargent, Martin & Levin (Donald J. Martin* of counsel), for appellant.

*Robert Abrams, Attorney-General (Vernon Stuart* and *Jeremiah Jochnowitz* of counsel), for respondent.

### OPINION OF THE COURT

SCHNEPP, J.

This appeal concerns the question of legal causation in the context of a claim for damages against the State of New York arising from the failure of a motorcyclist to negotiate a curve on a State highway interchange. The Court of Claims found after a trial that the State was negligent in failing to install "curve" and "stated speed" signs but that the absence of such signs was not a factor in the causation of the accident and that claimant had failed to sustain his burden of proving that the State's negligence was the

"proximate cause" of the accident. No issue is raised on this appeal concerning the finding of negligence and we do not disturb it. However, we disagree with the finding concerning the consequences which flowed from the failure of the State to install a curve sign.

The facts adduced at trial show that the interchange consists of one exit and two entrance ramps. The ramps lead to and from the north side of West Genesee Street in the Town of Geddes, Onondaga County and a divided highway that forms part of the Camillus Bypass. The easternmost entrance ramp [WGC] receives traffic proceeding in a westerly direction on West Genesee Street and the westernmost entrance ramp [SGS] receives the eastbound traffic. Ramp SGS intersects West Genesee Street at a right angle and from that point runs directly north a distance of 378 feet until it curves to the west. The Court of Claims described this curve as a 19 degree curve with a length of approximately 245 feet, a radius of 300 feet, a maximum superelevation of .08 and a recommended speed of 32 miles per hour. At a point about 195 feet beyond the start of the curve, ramp SGS merges with ramp WGC; this is approximately where the accident occurred. The curve continues some 50 feet beyond the point of merger. The width of ramp SGS varies from 30 feet at its intersection with West Genesee Street to 20 feet at the point of merger.

The edge lines and center line of ramp SGS are painted with reflectorized paint, with the edge line on the right-hand, or east, side running to the point of merger, and the edge line on the left-hand, or west, side (which becomes the south side) and the center line running beyond the point of merger. Reflectorized delineators, which are designed to be visible from a distance of 500 feet when illuminated by automobile headlamps, are on both sides of ramp SGS until the point of merger; from that point they continue around the curve on each side of the merged ramps, i.e., the west side of the now merged ramp SGS and the east side of the now merged ramp WGC. Reflectorized cable guide rails also define the west side of ramp SGS around the curve and beyond the point of merger, and the east side (which becomes the north side) of the merged ramps. The only sign on either entrance ramp is a yield sign controlling traffic

on ramp WGC near the point of merger with ramp SGS. Neither ramp is artificially illuminated.

On September 21, 1976 at approximately 9:15 P.M., Stephen P. Koester, the claimant appellant, stopped his 750cc Honda motorcycle at a traffic signal at West Genesee Street, made a left-hand turn onto ramp SGS and proceeded in the right-hand lane of traffic, accelerating to a speed of approximately 35 to 40 miles per hour, i.e., about 55 feet per second. The motorcycle was equipped with a fairing, i.e., wind screen, and luggage rack as accessories and had a quartz iodine headlight which provided approximately 100 feet of direct illumination and between 150 and 200 feet of peripheral illumination. It was dark, the weather fair and the pavement dry. Claimant followed the delineators on the right side of the ramp and when he reached a point 200 feet up the ramp he noticed the headlights of cars proceeding up ramp WGC. He testified that he "looked over at them and figured how they would affect my travel and if they were to merge with me what I would need to do such that everyone could merge". He further testified that he was 40 to 50 feet ahead of two cars which were in the left-hand lane of ramp SGS. When he reached the junction point of the two ramps, and was about 100 feet ahead of a vehicle on ramp WGC, the delineators on his right "stopped" and his headlight did not illuminate the delineators on the "northerly section of ramp WGC at or near its convergence with ramp SGS". He then inexplicably proceeded across the merged lanes and crashed into the cable guide rails on the north side of the merged ramps. He stated that "at the point where the delineators ran out * * * I was checking for traffic on my right, following the road, or actually checked for left, check for the traffic on my right. At that point I noticed there were no longer [any] delineators. It was a rather confusing situation." The next thing that he recalled seeing was the guide rail which was 30 to 40 feet in front of him. He sustained multiple injuries, the most serious of which resulted in the amputation of his left leg just below the knee.

Claimant admitted that he had traveled over ramp SGS twice before the accident during daylight hours, most recently two weeks before the accident, and that he had no

trouble negotiating the curve at speeds of 35 to 40 miles per hour. He also had traveled over ramp WGC during daylight hours on at least four prior occasions. As a result of this prior experience, he knew that the ramps merged, although he did not know the precise location of the merger.

Claimant testified that he had observed the reflectorized delineators on both sides of the ramp before the accident and that the delineators had not terminated on the left side of the ramp when he last saw them. He further said that he saw the dashed white center line of the ramp which separates the right and left lanes of traffic and which continues around the curve, that he observed the center line on the night of the accident, that he was traveling approximately four feet to the right of this line and one foot from the center line of the right-hand lane just before the crash and that he had used both the center and edge lines to guide him. He testified that he neither made any adjustments in speed when he entered the area where the ramps merged nor when he no longer observed reflective markers on his right, and that he was accelerating up the ramp until shortly before impact, i.e., until "slightly after the point that the curve began".

William Foote, a witness to the accident, testified that he was behind two cars in the left-hand lane of ramp SGS and that he was driving slower than, and lagged behind, claimant who was in the right-hand lane ahead of him. "[D]ue to the curve * * * and the two cars", Foote lost sight of claimant, but as he came around the curve he saw "some dust and a particle of something in the road" about 60 feet beyond the merger of the ramps. On cross-examination Foote explained that the two other cars "[e]vidently got a little [bit] ahead of [claimant]" and that he didn't think that "they ever seen [sic] [claimant] go over" and that he could see "the taillights of the cars that were in front of [claimant] going around the curve".

In dismissing the claim the Court of Claims relied upon *Applebee v State of New York* (308 NY 502). It found that claimant "was fully aware of the existence of the curve" and that a curve sign "would have given * * * no more information that was already available to him." In addi-

tion, the court found that the absence of the speed sign did not play a part "in the happening of this accident". Since no question is raised considering the finding that the State breached its duty to claimant we consider only the question of causation.

The principle is well-established that where a duty has been breached an injured party may recover damages for "the proven harmful consequences proximately caused by the breach." (*Johnson v State of New York,* 37 NY2d 378, 383; see, also, *Becker v Schwartz,* 46 NY2d 401, 414). It is plaintiff's "burden to show that defendants' conduct was a substantial causative factor in the sequence of events that led to [his] injury (see Restatement, Torts 2d, § 430; Prosser, Torts [4th ed], § 42)." (*Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507, 520; see, also, *Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315; *Sewar v Gagliardi Bros. Serv.,* 69 AD2d 281, 289, affd 51 NY2d 752.) That showing need not be made with absolute certitude nor exclude every other possible cause of injury (see *Spett v President Monroe Bldg. & Mfg. Corp.,* 19 NY2d 203, 205; *Wragge v Lizza Asphalt Constr. Co.,* 17 NY2d 313, 321; *Dillon v Rockaway Beach Hosp. & Dispensary,* 284 NY 176, 179). It is sufficient that facts and circumstances are shown from which causation may be reasonably inferred (see *Dunham v Village of Canisteo,* 303 NY 498, 506; *Sewar v Gagliardi Bros. Serv.,* 69 AD2d 281, 289-290, *supra; Lee v Flight Safety,* 63 AD2d 994, 995-996; see, also, PJI 2:70). As the Court of Appeals said in *Cornbrooks v Terminal Barber Shops* (282 NY 217, 223), "It is not enough that the defendant, in an effort to break the chain of causation, should prove that plaintiff's injury *might* have resulted from other possible causes, nor is it required of the plaintiff that he eliminate by his proof all other possible causes. 'The existence of remote possibilities that factors other than the negligence of the defendant may have caused the accident, does not require a holding that plaintiff has failed to make out a *prima facie* case. It is enough that he shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred.' (*Ingersoll* v. *Liberty Bank of Buffalo,* 278 N.Y. 1, 7.)" (Emphasis in original; see, also, *Dunham v Village of Canisteo,* 303

NY 498, 505-506, *supra.*) Prosser explains that it is the plaintiff's burden to introduce "evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not." (Prosser, Torts [4th ed], § 41, p 242.) Once the court is satisfied that a prima facie case has been established, proximate cause presents a question of fact for the finder of fact (see *Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315, *supra;* see, also, *Monahan v Weichert,* 82 AD2d 102, 107).

Generally, the absence of a warning sign cannot be excluded as a cause of an ensuing accident unless it is found that the accident would nevertheless have happened. This finding can only be made if the driver's awareness of the physical conditions prescribed the same course of action as the warning sign would have, if the driver, by reason of his recollection of prior trips over the same road, "actually had the danger in mind" as he approached it on the highway, or if other signs gave adequate warning of the danger (see *Gleich v Volpe,* 32 NY2d 517; *Applebee v State of New York,* 308 NY 502, *supra; Tely v State of New York,* 33 AD2d 1061, 1062; *Rugg v State of New York,* 284 App Div 179).

Applying these principles here, the Court of Claims erred in finding that the absence of a curve sign was not a "proximate cause" of the accident. The proof does not sustain a finding that claimant actually had the curve in mind as he approached it. While claimant was aware of the general course of the ramp and the existence of the curve from having traveled over it on prior occasions during daylight hours, it was a dark night and he had just left a lighted highway and entered on the unlighted ramp. He knew that the ramps merged but neither the precise location of merger nor the configuration of the curve was uppermost in his mind. Although the path of the curve was clearly defined by delineators, reflectorized guide rails and pavement markings, claimant was concerned about the approach of vehicles on ramp WGC, and when the delineators on the right side of ramp SGS stopped at the point of convergence of the ramps on the curve, he became confused. Without culpability on his part he obviously did not know where he was on the road. Instead of proceeding

around the curve, which he could have easily negotiated, he inexplicably proceeded across the merged lanes. When next he saw the guide rails 35 to 40 feet in front of him, they were too close to avoid and the impact occurred less than a second later. This was too little time to comprehend a sudden new situation, consider alternatives and reach a decision as to a course of action that would avoid disaster.

The trial court's finding that "[a] further indication of the path of the curve could have been obtained by observing the other vehicles that had preceded the claimant up the ramp that evening" is speculative at best, given the absence of any testimony from claimant that he saw the taillights of any other vehicle. Claimant testified that the other vehicles were 40 to 50 feet behind him just prior to the accident. The court apparently made its finding based on the inferences which it drew from the testimony of Foote, the only eyewitness. Foote, testified that, as he proceeded up the ramp, claimant was in the right-hand lane between him and two vehicles in the left-hand lane. At the critical moment, however, just prior to the accident, he was also concerned with oncoming traffic on ramp WGC and lost sight of claimant and the other vehicles.

Further, the finding that claimant "actually traversed more than three-quarters of the length of the curve" is ambiguous and indeed has no foundation in the proof. While it is true that claimant went off the road at a point approximately 195 feet beyond the point of curvature, it is clear from his testimony and a review of the photographs of the accident scene as well as the blueprints of the interchange that he did not follow the contour of the curve but proceeded straight across the curve and the merged lanes of the ramps to the point of impact. While claimant may have traveled 195 feet on the curve, his route was ostensibly linear and in no real sense did he "traverse" a substantial part of the actual curved portion of the highway before crashing.

Since this is a nonjury case, "this court's inquiry is not limited to whether the findings were supported by some credible evidence. If it appears on all the credible evidence that a different finding or a finding different from that of the court is not unreasonable, then this court must weigh

the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from such testimony (*Spano v Perini Corp.*, 25 NY2d 11). It is within the power of this court to grant the judgment which upon the evidence should have been granted by the trial court." (*Shipman v Words of Power Missionary Enterprises*, 54 AD2d 1052, 1053; see, also, *Larkin v State of New York*, 84 AD2d 438; Court of Claims Act, § 24; 7 Weinstein-Korn-Miller, NY Civ Prac, par 5501.20.) Weighing the relative probative forces of the conflicting testimony and the relative inferences that may be drawn from such testimony, claimant's proof affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the State was a substantial factor in bringing about claimant's mishap and his resulting injuries, and thus "proximate cause" was established. The State failed in its duty to protect claimant against the event which in fact took place. A curve sign would have given claimant notice and reminded him of the oncoming curve while he was still a few hundred feet from the danger. It would have jogged his memory as to the severity and general configuration of the curve and alleviated the claimant's momentary confusion as to the highway layout immediately prior to the accident.

Upon this record it is contrary to the weight of the evidence to find that the absence of a curve sign was not a "proximate cause" of the accident. We find that the absence of the curve sign was a substantial causative factor in the sequence of events which led to claimant's injury. There was no finding and, indeed, there is no evidence in this record of any negligence or culpability on the part of claimant: he was operating his motorcycle at less than the maximum speed limit; he was alert and observant; and the vehicle was in proper mechanical working order. The only inference that may be drawn from the evidence is that the motorcycle left the highway and struck the guide rail because claimant lost his bearings as to the location of the highway and curve at the point where the two ramps merged and, on this record, this cannot be held to constitute negligence.

In view of this determination there is no need to consider whether the absence of a "stated speed" sign was a "proximate cause" of the accident. It is noted, however, that, as the court found, there is no proof that excessive speed played any role in causing the accident.

Because the record is complete there is no reason to remit this case to the Court of Claims to fix damages. Claimant is not entitled to damages for loss of earnings or diminution of earning capacity since the record contains no such proof. We award claimant damages, however, in the sum of $400,000 which we find to be fair, adequate and sufficient compensation for the reasonable medical expenditures incurred by him to date, for his future expenses for prosthetic devices, for conscious pain and suffering to date and for his injuries, including those which are permanent.

Accordingly, the judgment of the Court of Claims should be reversed and judgment should be granted in favor of claimant in the amount of $400,000.

DILLON, P. J., DOERR and DENMAN, JJ., concur with SCHNEPP, J.; MOULE, J., dissents and votes to affirm the judgment on the opinion at Trial Term, LOWERY, J.

Judgment reversed, on the law and facts, with costs and judgment granted in favor of claimant in sum of $400,000.