Irene McCLUSKEY, individually and as Administratrix of the Estate of Joseph M. Boland, Michael Boland and Mary Boland, Plaintiffs,

v.

The UNITED STATES of America, Holmes Ambulance Company and "John Doe", Defendants.

No. 82 Civ. 5997 (IBC).

United States District Court, S.D. New York.

March 21, 1984.

See also D.C., 562 F.Supp. 515.

Walter A. Lesnevich, New York City, for plaintiffs.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendant U.S.A.; Marc H. Rosenbaum, Asst. U.S. Atty., New York City, of counsel.

Acito & Klein, New York City, for defendant Holmes Ambulance; James P. Drohan, Yonkers, N.Y., of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

Plaintiff Irene McCluskey is the sister and Administratrix of the Estate of Joseph M. Boland, a veteran of the United States Army, honorably discharged with a 100 percent disability for nervous disorder. Together with her parents and acting in both her capacities, Mrs. McCluskey commenced on September 9, 1982 this wrongful death action for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* based upon the defendants' alleged negligent conduct resulting in the death of Mr. Boland. The trial to the Court on September 28–29, 1983 was bifurcated—the issue of liability to be ascertained first, damages to be taken up only if our instant determination favors the plaintiffs.

This litigation discloses a tragedy which should never have occurred; the facts exemplify the horrible reality that can result from people's inhumanity towards one another.

On the morning of February 26, 1981, Joseph M. Boland travelled to the New York Regional Office of the Veterans Administration at 252 Seventh Avenue in Manhattan, New York ("Manhattan VA") from the home that he shared with his parents in Rockaway Park, New York. (Tr. 219–20)[1] This hospital visit was not out of the ordinary for Mr. Boland; he had been going there daily for approximately one and a half years. (Tr. 135) The patient suffered from a depressed mental condition for many years, symptomized by hallucinations, suicidal thinking, delusions, and generally disturbed behavior, and had been hospitalized five to six times commencing in 1962. (Tr. 134–35) Since 1979, Mr. Boland had attended the outpatient Day Treatment Center at the Manhattan VA where his psychosis greatly improved

and stabilized, with the sole exception of a brief hospitalization in September 1980.

On this particular day (February 26, 1981), Mr. Boland was playing cards in the Day Treatment Center when the Center's coordinator, Mr. Steven Schrift, observed that Mr. Boland was making mistakes unusual for him. Mr. Schrift called Dr. Tershakovec, a staff psychiatrist at the Manhattan VA, who proceeded to examine the patient's record, interview him, and administer orientation and memory tests. (Tr. 134)[2] The doctor concluded that the symptoms were related to a kidney disease called uremia from which Mr. Boland had suffered since 1973. (Tr. 136) Uremia occurs when the waste products of the body cannot be secreted because the kidneys malfunction and the waste consequently enters the bloodstream, affecting the brain as well as the rest of the body. (Tr. 137) At the time of the examination, Dr. Tershakovec determined that Mr. Boland's brain impairment was mild: he was slightly disoriented, his immediate memory loss was more severe, but his remote memory was unaffected. (Tr. 137–38) The doctor testified: "[U]remia is caused by the accumulation of waste products in the blood, and it is a process that is slow. In this particular instance, I thought it was the very beginning of that condition, seeing that impairment of brain function is the most sensitive test, and there was no other evidence of approaching uremia such as muscle twitching, vomiting, nausea, or convulsions. So the condition was [days or perhaps even weeks] away from coma." (Tr. 138–39)

Dr. Tershakovec's medical opinion was corroborated at trial by the expert testimony of Dr. Robert Feingold, an instructor in medicine and supervisor of the dialysis and transplant units in Mt. Sinai Hospital in Manhattan. From his review of the records containing information on Mr. Boland's condition on February 26, 1981, Dr.

---

1. Throughout this opinion, the letters "Tr." followed by a number in parentheses indicates a particular page number in the trial transcript. The same applies to an "Ex." which refers to a specific exhibit.

2. Dr. Peselow was Mr. Boland's regular physician at the Manhattan VA. However, on February 26, 1981, Dr. Peselow was absent from the hospital and so Dr. Tershakovec examined Mr. Boland. (Tr. 134)

Feingold testified that the patient's condition was neither emergent nor critical. (Tr. 163)

The Veterans Administration hospital on Kingsbridge Road in the Bronx ("Bronx VA"), unlike the Manhattan VA, had an advanced kidney treatment center, including dialysis machines which remove the waste products from the bodies of uremia patients. (Tr. 139) After being informed by Mr. Boland that formerly he had been treated by a Dr. Kahn in the Bronx VA, Dr. Tershakovec called Dr. Kahn. The latter advised Dr. Tershakovec that he wanted to see the patient in the Bronx VA (Tr. 138)—an idea to which Mr. Boland was quite receptive. (Tr. 141)

The procedure for transporting a patient from the Manhattan VA to the Bronx VA required a doctor to fill out a transfer form, called a 1010M, identifying the complaint and mental status of the patient; also contact persons functioning at the medical arriving center (an extremely important factor in this case). The 1010M additionally had space in which motor transportation had to be specified. (Tr. 181) Dr. Tershakovec filled out the form but omitted the motor transportation instructions. Miss Grace Cervini, a public health registered nurse at the Manhattan VA, received Mr. Boland's 1010M and tried unsuccessfully to locate the doctor to get his advice concerning transportation. (Tr. 174, 182) Not wanting to delay Mr. Boland's transfer any longer, Miss Cervini arranged for the patient's transportation, a task she had done for others in the years prior to February 26, 1981. (Tr. 182)

Miss Cervini called the transportation department at the Manhattan VA and spoke to Mrs. Linda Yates, a clerk "filling in" that day. (Tr. 199–200) The two discussed the mode of transportation alternatives; Miss Cervini concluded that an ambulette, a vehicle which does not contain all of the medical equipment usually installed in an ambulance, would be appropriate. Miss Cervini further instructed Mrs. Yates to order a *two-man* ambulette since Mr. Boland was "confused." (Tr. 175)

The testimony of Dr. Feingold at trial supported Miss Cervini's decision. The doctor stated that "all [Mr. Boland] needed was somebody to make sure that he arrived at the VA. In other words ... I don't think he needed strict medical supervision during the transportation." (Tr. 164)

One of the ambulance companies with which the Manhattan VA had contracted to provide ambulance and ambulette services was defendant Holmes Ambulance Company ("Holmes"). The contract between the parties contained an indemnification clause under which Holmes indemnified the Government from any negligence caused by the latter unless the Government was the "sole, competent, and producing cause of such ... liability." (Plaintiffs' Ex. 1 at 3)

Mrs. Yates telephoned Holmes, spoke to a clerk named Mona, and ordered a two-man ambulette to transport Mr. Boland "[t]o the Bronx VA, *to the admitting area*" (underscoring ours). (Tr. 194) In keeping with her normal course of duties, Mrs. Yates made out a 3" × 5" index card (Government Ex. F) in which she specified Mr. Boland's name, address, claim number, social security number, diagnosis, that he should be admitted to the Bronx VA promptly, that a 1010M form was being sent with Mr. Boland, and that he was being transported to the Bronx VA by a two-man ambulette. (Tr. 196, 212)

Holmes dispatched Jose Ralph Capella, a para-transit licensed driver of an ambulette, to the Manhattan VA to pick up Mr. Boland for transfer to the Bronx VA. (Holmes Ex. C at 5–6) From the trial record we draw a strong inference that this was not the first occasion on which Mr. Capella drove patients from the Manhattan VA to the admitting room of the Bronx VA. We regard as unworthy of belief his contention in his deposition that he transported patients only to the radiation therapy room of the Bronx VA (Holmes Ex. C at 50–51); this statement was conveniently created to justify Mr. Capella's subsequent action. As will be seen, he was no stranger to the Bronx VA facility.

Extremely unfortunate is the distressing fact that Mr. Capella was unavailable for testimony at trial. On September 21, 1983, the original date scheduled for this trial, trial counsel for Holmes stated that considerable effort to locate him had proven unsuccessful; accordingly, we granted Holmes a continuance to search further for Mr. Capella. *See* letter dated November 21, 1983 from trial counsel (James P. Drohan, Esq.) addressed to the Court. Holmes hired an investigator named Freddie Velez whose search efforts proved unavailing. On the witness stand, Mr. Velez speculated that Mr. Capella was in a hospital in Puerto Rico (Tr. 14); Velez made contact in that territory with a member of his family who was not an investigator and who could not find Mr. Capella in any of the hospitals in Puerto Rico. (Tr. 15) On the first day of trial, we directed that the parties continue to exhaust all efforts to "locate this all-important witness." (Tr. 19) However, Mr. Capella was not to be found. Holmes did not subpoena Mr. Capella's cousin in New York who had informed Mr. Velez that Mr. Capella had moved in with his mother in Puerto Rico. (Tr. 13–14; 16–17) On the evidence adduced, we are unable to assess the extent of the effort expended to locate him.

Mr. Capella was deposed on April 14, 1983 regarding the events that took place during the hour he spent with Mr. Boland on February 26, 1981. The sworn transcript of this deposition was introduced into evidence as Holmes Exhibit C; we find parts of his account supported by the total trial record; other equally vital contentions are either wholly unpersuasive, clearly exaggerated or plainly false.

It is our conclusion and we so find that the following occurred during the interval between Mr. Capella's entrance into the Manhattan VA and his exit from the Bronx VA.

Mr. Capella arrived at the Manhattan VA at approximately 2:55 P.M. (Holmes Ex. C at 38) Upon seeing Mrs. Yates, who he knew inasmuch as he had picked up and delivered patients to various building of the Bronx VA two to three times a week for three or four months (Tr. 197–98), he flashed his trip ticket and inquired into the whereabouts of Mr. Boland. From her brief glance at the ticket, Mrs. Yates noted Mr. Boland's name and two signatures; she was not sure whether they constituted Mr. Capella's printed name followed by his signature or the names of two separate people which would have indicated the presence of two attendants in the ambulette. (Tr. 210)

We regard it as significant in the extreme to add at this juncture of the opinion the following vital bit of testimony by Mrs. Yates which we adopt: On various occasions "Ralph was—he was very nervous. I guess that would be the best way to describe him. Even when he stopped and chatted with us for a while, he would always pace back and forth, he would never sit down." (Tr. 204) Indeed, from the total trial record, we get the distinct impression that Mr. Capella was an extremely nervous, always "on edge" type of individual, clearly unsuited for the sensitive, careful task to which Holmes assigned him. Moreover, on February 26, 1981 he was in a particular rush (Tr. 202–04)—his superior, Steven Solarch, had instructed him to be at the Taxi and Limousine Commission in Brooklyn by 5:00 P.M. if he wanted his vehicle inspected. (Holmes Ex. C at 24–25) This pressure, added to Mr. Capella's generally nervous disposition, made him an especially inappropriate person to transport ill patients.

Mrs. Yates informed Mr. Capella that Mr. Boland was in Nurse Cervini's office. He met the patient there, and Miss Cervini handed him a large brown government envelope containing the 1010M as the sole enclosure. Miss Cervini had written in large print across the envelope the words "Kingsbridge Veterans Administration Hospital, Admitting, per Dr. Tershakovec" (underscoring ours) as well as the name of the VA center from which Mr. Boland was being transported, Dr. Tershakovec's telephone number, and the patient's full name and social security number. Miss Cervini

asked Mr. Capella if he wanted a wheelchair for Mr. Boland and whether there was another attendant in the ambulette. Mr. Capella responded negatively to the first inquiry and affirmatively to the second. (Tr. 176–77) [3] We are convinced that the affirmative answer was deliberately false.

Mr. Capella escorted Mr. Boland, who was ambulatory, to his one-man ambulette (not the two-man ordered) and strapped him behind a seatbelt. Mr. Capella then drove to the Manhattan VA center located at 23rd Street and First Avenue to pick up a Mr. Thomas Connolly, a dialysis patient, and to transport him to his residence at 419 East 93rd Street in Manhattan. (Holmes Ex. C at 19–20) When they arrived at Mr. Connolly's apartment building, Mr. Capella helped the wheelchair-bound patient to his apartment, keeping Mr. Boland locked in the ambulette. At about 3:19 P.M. Mr. Capella returned to the ambulette to drive Mr. Boland to the Bronx VA. (Holmes Ex. C at 21–22)

Construction of a new building at the Bronx VA to house all of the patients and equipment had almost been completed by February 26, 1981; all that remained open in the old building by that date were the radiation therapy facility (Tr. 282) and perhaps the dental clinic (Tr. 259). From the total trial record we draw the strong inference that this area was apparently inactive. The emergency and admitting rooms, the main lobby, all the patients and the hospital equipment had been transferred to the new building. (Tr. 236–38, 280–81, 283)

Mr. Capella drove into the Kingsbridge Road entrance of the Bronx VA, located on the north side of the hospital, at approximately 3:45 P.M. (Holmes Ex. C at 40) The old building stood on the eastern part of the hospital's premises; the new building was directly across on the west. A peripheral road wound south along the east side of the old building, turned westward,

then continued north between the west side of the old building and the east side of the new. The road ended back at the Kingsbridge Road entrance. (Government Ex. A)

The entrance to the main lobby of the new building was directly off the north-south midway point of the part of the peripheral road between the two buildings. *The admitting room of the Bronx VA was located 136.5 feet south of the main lobby in the new building* (Tr. 304); directly adjacent and south of the admitting room was the emergency room. (Tr. 237–38) Ambulances and ambulettes discharging patients drove around the peripheral road to the ramp outside these two rooms. Ambulette patients would normally be escorted through the glass doors of the admitting room into the reception admitting area. Ambulance patients were brought into the emergency room from where the view of the admitting room was unobstructed except within six feet of the door leading to the ramp. (Tr. 291)

A passageway connecting the old building to the main lobby of the new building had been constructed in order to transfer patients and equipment; it had not yet been closed by February 26, 1981. The radiation therapy facility still functioning in the old building was located just south of the passageway entrance in the old building. (Tr. 281–82) A door in the radiation therapy area provided another exit from the hospital. (Tr. 282)

When Mr. Capella drove onto the Bronx VA grounds, a security guard in a police booth adjacent to the Kingsbridge Road entrance gave him directions to the admitting area. (Holmes Ex. C at 22, 43) At his deposition, Mr. Capella testified that the guard told him he "couldn't go through the front entrance" (Holmes Ex. C at 22); he "couldn't go straight because they were fixing, transferring the old building to the

---

**3.** In his deposition, Mr. Capella testified that he did not speak to Miss Cervini on that date; rather, Nurse Olive Glasgow signed his trip ticket and gave him an envelope inscribed with Mr. Boland's name only. (Holmes Ex. C at 32–33)

He further testified that no one asked him whether he had an attendant with him. (Holmes Ex. C at 18) We find this part of Mr. Capella's testimony entirely unconvincing and reject it *in toto.*

new building. They didn't want anybody to go in there." (Holmes Ex. C at 43) Unimpressed, we interpret Mr. Capella's statements to mean that he was told he could not drive on the peripheral road to the ramp of the new building's admitting room because patients or equipment were still being transferred. He therefore drove south on the peripheral road and stopped on the east side of the old building outside the radiation therapy area. (Holmes Ex. F; Holmes Ex. C at 44)

Mr. Capella then deposed that he took Mr. Boland through the radiation therapy door and left him unattended in the old building in what he believed to be the admitting area, immediately north of the entrance to the passageway. (Holmes Ex. C at 47–49) He stated that he had signed in at a police station outside the radiation therapy facility (Holmes Ex. C at 45) and had handed the papers accompanying Mr. Boland to a white, blond, female clerk in her 20's or 30's in the area where he left the patient. (Holmes Ex. C at 49) Mr. Capella departed from the hospital within 10 minutes of his arrival and was at the Taxi and Limousine Commission in Brooklyn by 4:15 P.M. (Holmes Ex. C at 25–26), 45 minutes ahead of his scheduled 5:00 P.M. appointment—a fact supportive of our firm conviction that he was in a rush to get to the garage.

We regard as totally unconvincing Mr. Capella's testimony that he was instructed not to drive past the radiation treatment facility of the old building, that he left Mr. Boland at an admissions area in the old building, and that he gave the envelope containing Mr. Boland's 1010M form to a clerk on duty in that admissions area.

First, we find it unpersuasive that Mr. Capella believed he could not go around the peripheral road because of the ongoing transfer process. Although he stated that he knew of no admissions or emergency areas in the new building (Holmes Ex. C at 56), Mr. William Fraser, chief of ambulatory care and the processing section of medical admission services at the Bronx VA in February 1981, (Tr. 234) testified at trial that he personally put up signs reading "Ambulance Entrance" with arrows pointing toward the admissions/emergency area of the new building approximately every 50 feet along the peripheral road up to the entrance itself. (Tr. 243) Additionally, the guards in the police booth adjacent to the Kingsbridge Road entrance were instructed "to direct all traffic to the emergency room around the road behind the old building up to the ambulance entrance." (Tr. 244) In sharp contrast to Mr. Capella's contention that the guard with whom he spoke gave him different information, Mr. Donald Grillo, medical administrative assistant at the Bronx VA on February 26, 1981, testified at trial that there was no place other than the emergency/admitting area of the new building where ambulances or ambulettes would bring patients on that date. (Tr. 289) Further, Mr. Fraser testified that he saw ambulettes arriving and departing only from the proper area of the new building. (Tr. 240–41)

Second, we do not believe that Mr. Capella left Mr. Boland in a functioning admissions area in the old building. As we have already noted, with the exceptions of the radiation therapy facility and perhaps the dental clinic, the old building was no longer in use; Mr. Fraser stated that the old emergency room area had been "padlocked" by the date in question. (Tr. 247)

We find that Mr. Capella escorted Mr. Boland into the radiation treatment facility and through the passageway to the main lobby of the new building, 136.5 feet away from the admitting room, where he "deposited" the patient unattended and promptly left the VA to drive to the Taxi and Limousine Commission. Our finding is supported by Mr. Capella's statement to Mr. Solarch that the area in which he left Mr. Boland "had ropes like in a bank." (Government Ex. J) Mr. Capella, contradicting his earlier statements, confirmed this observation at his deposition, adding that the area with the bank type of ropes (where he dropped off Mr. Boland) was in the new building. (Holmes Ex. C at 64; Holmes Ex. F) We have no doubt that the area with these

ropes was the main lobby of the new building; both Messrs. Fraser and Grillo testified unhesitatingly that this description fit the main lobby. (Tr. 283; Government Ex. J) Our conclusion is further fortified by Mr. Capella's statement to Mr. Peter Pascarelli, chief of the medical admissions service of the Manhattan VA, at a private meeting on April 8, 1981 at which time Mr. Capella related to Mr. Pascarelli that "he took Mr. Boland through radiation therapy to the reception area..." (Tr. 278; Government Ex. K)

Third, we reject Mr. Capella's statement that he gave the envelope with Mr. Boland's 1010M form to a white woman with blond hair in her 20's or 30's working in the admission area of the Bronx VA. We believe Mr. Grillo's impeaching testimony that no one who worked in the admissions area fit that description; in fact, the person Mr. Grillo thought came closest to Mr. Capella's description was "a heavy-set woman, approximately in her 50's, black hair.... That [was] about the only Caucasian." (Tr. 286) Besides Mr. Capella's totally incredible testimony, there is no evidence that Mr. Boland's medical records from the Manhattan VA ever accompanied him into the Bronx VA. We are convinced and find they did not.

Thus, at about 4:00 P.M. on February 26, 1981, Mr. Boland was sitting unattended in the main lobby of the Bronx VA. No hospital attendant had any papers or other form of notice clearly stating that he was in need of treatment for his uremic condition. More tragically, however, Mr. Boland was unaware that only 136.5 feet away from him, his sister and brother-in-law were anxiously awaiting his arrival at the emergency/admitting room area of the hospital. We cannot overemphasize the disastrous fact that Mr. Boland was not taken to the *"admitting area"* as distinctly directed by the Manhattan VA to Holmes and its single designated ambulette personage, driver Capella. And, sad to relate, he was not turned over to the appropriate hospital person charged with the duty of attending to a United States veteran being transferred to the Bronx VA hospital for medical attention. With unforgivable neglect, total indifference and extreme inhumanity, Mr. Capella merely "dumped" Mr. Boland—left him alone and unattended—at a clearly wrong area (overwhelmingly so) and rushed away! We are simply appalled.

Sometime around 1:00 P.M. on this same date, Mrs. Irene McCluskey was telephoned by her mother and informed that her brother had experienced some difficulties at the Manhattan VA, that the examining physician determined that he needed dialysis, and that he was being transported to the Bronx VA. (Tr. 69, 106) Mrs. McCluskey, who was a registered nurse and wanted to give her brother support as he underwent the dialysis treatment (Tr. 70), promptly drove her children from their Rockland County, New York home to the house of her sister-in-law, then picked up her husband at work; the couple proceeded to the emergency room of the Bronx VA where they arrived at approximately 2:20 P.M. (Tr. 69–70) No one in the emergency room knew who or where Mr. Boland was. (Tr. 71)

The McCluskeys waited six hours for Mr. Boland in the emergency room—a distance of approximately 136.5 feet from the area where Mr. Boland was left unattended by Mr. Capella. Throughout this time period, Mr. McCluskey stood by the doors of the emergency room and Mrs. McCluskey waited in the same room, near the admitting room entrance. (Tr. 78) The two repeatedly searched the area. (Tr. 99–100) As Mrs. McCluskey testified: "We never left [the emergency/admitting area]. We never sat down except when I was in the phone booth making phone calls. But even from the phone booth you could see the doors [leading to the ramp where ambulances and ambulettes arrived]." (Tr. 101) Her husband's testimony was similar: "The whole time that we were there ... we stayed in that area ... checking with the desk if they had heard anything.... We never left; we never ate; we never did anything. We were just watching constantly for him to come and he never showed up.... [M]y brother-in-law [who

joined us to help us] went to get coffee. I think we had coffee. [We used the bathrooms, but they] were right there." (Tr. 112–13)

At about 4:15 P.M. Mrs. McCluskey called the Holmes Ambulance Company to inquire about her brother's whereabouts. She was informed by the operator there that a driver had picked up Mr. Boland and had delivered him to the Bronx VA. (Tr. 74) Mrs. McCluskey telephoned Holmes four to five times between 4:15 and 8:00 P.M. that day; on at least one of the calls she inquired whether Holmes could contact the driver. She testified that the operator's response was, "Look, I don't know where he is. Don't bother me any more. Maybe he went to a friend's house"—a crude and nasty retort seemingly on the rise. (Tr. 75)

During this waiting period, Police Officer Kitz who patrolled the area where the hospital was located (and was also a neighbor of the McCluskeys) appeared in the Bronx VA on a different matter. Upon hearing of the McCluskeys' extremely vexatious problem, Mr. Kitz said the police would watch out for him. (Tr. 104, 114)

Additionally, Mr. Grillo made efforts to locate Mr. Boland at the Bronx VA: he searched for the patient's name in the main lobby and the reception admitting logs,[4] and he checked the emergency room, dialysis unit, and other wards of the hospital. No one knew or had any record of Mr. Boland. (Tr. 287–88)

Mr. and Mrs. McCluskey departed from the Bronx VA at 8:30 P.M. (Tr. 103) At approximately 3:45 A.M. on February 27, 1981, seven hours later, they received a telephone call from Mrs. McCluskey's mother and learned the tragic news: Mr. Boland had been hit by an automobile and killed on the Major Deegan Expressway in the vicinity of the Bronx VA. (Tr. 76) Left alone and unattended in a strange area, he had wandered out of the building into the open area and, at about midnight, onto the highway where disaster befell him—to the everlasting shame of the person charged with his care.

Around midnight, Mr. George Anton was driving north on the Major Deegan, returning to his Mahopac, New York home from a meeting in Manhattan of the New York Army National Guard (Tr. 222–23) Just north of the 233rd Street exit, Mr. Anton's vehicle hit a pedestrian, who he later learned was Mr. Boland. (Tr. 226–27) The Estate of Mr. Boland settled with Mr. Anton for $16,000.

Plaintiffs in the instant case allege: (1) negligence on the part of all three defendants resulting in the wrongful death of Mr. Boland; (2) that Mr. Boland endured pain and suffering from the time he was picked up at the Manhattan VA until his death; (3) that Holmes and Capella are liable for punitive damages; (4) that the individual plaintiffs suffered emotional distress during the time that Mr. Boland's whereabouts were unknown; and (5) that the personnel of the VA and of Holmes evinced wanton and callous disregard of human life constituting the tort of outrage.

In essence, except for the wrongful death cause of action, the allegations set forth in plaintiffs' complaint state theories of damages rather than liability. Since we have not yet tried the issue of damages, we do not at this time undertake to decide whether the plaintiffs may recover pecuniary or punitive damages, or for emotional distress or pain and suffering.

The United States cross-claims against Holmes, asserting that if the Government is found liable, it is entitled to indemnification for all or part of the judgment recovered against it as provided by the terms of the contract between the United States and Holmes, or it is entitled to indemnification,

---

**4.** On February 27, 1981, after he learned of Mr. Boland's death, Mr. Fraser also examined the admitting reception area log book as well as the part of the main lobby log book that he was able to find, all in his search for the decedent's name. Concerning the part that could not be retrieved (the hospital destroyed these records after two to three days) he questioned the person who worked at the main lobby on February 26 whether she had any recollection of Mr. Boland. His search revealed nothing. (Tr. 260–62)

contribution or judgment for all or part of the judgment recovered against it by Holmes and Mr. Capella.

Holmes and Mr. Capella cross-claim against the United States and allege that if Holmes and/or Mr. Capella are found liable, then the damages were wholly or partially sustained because of the negligence, breach of warranty, and/or breach of contract of the Government to the extent that Holmes and/or Mr. Capella would be entitled to contribution, apportionment and indemnification from the Government.

Upon the convincing facts in the total trial record adduced before us, we find that Holmes and Mr. Capella, and not the Government, brought about the wrongful death of Mr. Boland. We now go to the law applicable to the established facts.

*The Law*

■ Recovery in a wrongful death action requires that the following elements be satisfied: death of a human being, negligence of a defendant causing the death, survival of distributees suffering pecuniary loss because of the death, and appointment of a personal representative of the decedent. *Chong v. New York City Transit Authority,* 83 A.D.2d 546, 441 N.Y.S.2d 24, 25–26 (2d Dept.1981). In the instant case, we know that Mr. Boland is the decedent and that Mrs. McCluskey is the Administratrix of the Estate. We cannot at this time determine whether the plaintiffs suffered pecuniary loss since we have not yet tried the issue of damages. Thus, we need only find negligence and therefore liability on the part of at least one of the defendants in order to enable plaintiffs to sustain their wrongful death cause of action.

■ To make out a *prima facie* case of negligence, a plaintiff must prove that the defendant breached a duty of care owing to the plaintiff, that plaintiff suffered injury, and that a causal connection existed between the breach and the injury. *See Livingston v. Gribetz,* 549 F.Supp. 238, 242 (S.D.N.Y.1982); *Koester v. State,* 90 A.D.2d 357, 457 N.Y.S.2d 655, 658 (4th Dept.1982). We will examine these factors independently to determine who was negligent and for what in the instant case.[5]

### 1. Breach of a Duty of Care

■ One who owes a duty to another is obliged to perform it reasonably in light of any apparent risks. That which is reasonable varies with the facts of each situation. *See Livingston, supra,* at 242; *Dunham v. Village of Canisteo,* 303 N.Y. 498, 502–03, 104 N.E.2d 872, 875 (1952).

■ Preliminarily, we find that both the Government and Holmes owed a duty of care for the well-being of Mr. Boland. Dr. Tershakovec testified that Mr. Boland was not quite "free" to leave the Manhattan VA: "He would have had to have been brought to the attention of somebody competent to decide on that question.... [T]he physician then is responsible for the decision whether a person [in this situation] can leave, signing the release, or, in some cases, the person has to be hospitalized and even against his will if his life is in danger." (Tr. 149) By the doctor's own statement, the Manhattan VA personnel were duty bound to care for Mr. Boland, whose uremic condition, as the doctor and staff knew, was growing worse.

Similarly, the very nature of Holmes' business—an ambulance service—imposes upon it a duty to care for patients being transported. It is common sense that neither ambulances nor ambulettes are required to move people who are healthy; a duty to act with care is mandated by the undertaking of providing vehicles properly manned and equipped with medical instruments for the purpose of transporting unhealthy and dependent individuals.

Having concluded that both the Government and Holmes owed a duty of care to Mr. Boland, we next must consider the standard by which to measure their conduct in order to decide whether they satisfied their duties. In this quest, we are guided by the case of *Murray v. United*

---

**5.** Mr. Boland's "injury" being apparent, we need not separately address it.

*States*, 329 F.2d 270 (4th Cir.1964). In *Murray*, the decedent had been taken to a VA hospital where the attending doctor found him to be intoxicated. Since the hospital regulations forbade treating a patient in the decedent's condition, the doctor arranged for him to be sent to a second hospital accompanied by a guard and attendant due to the possibility of nausea and strangulation from the vomitus. An examination was conducted at the latter hospital and, after informing the doctor at the VA, the decedent was turned over to the police department. Within a few moments after his arrival at the police station, the decedent gagged on his vomitus and died.

In deciding whether the doctor at the VA hospital breached his duty of care since he was aware both of the possible health hazard and that the decedent was being taken to the police station, the Fourth Circuit Court of Appeals held that "[the doctor's] duty went [no] further than a careful and safe delivery of the patient into competent hands.... This he did. With no default in duty, neither he nor his employer is answerable for [the decedent's] death." *Id.* at 272.

We adopt the standard used in *Murray* in ascertaining the duty of the Government and Holmes in the instant case; we find that both defendants were required to carefully and safely deliver Mr. Boland into the custody of personnel competent to attend to him. Our conclusion is bolstered by the testimony of Doctors Tershakovec and Feingold that in their opinion Mr. Boland should have been turned over to an *admitting nurse* in the Bronx VA. (Tr. 151, 168)

■ In this context, we hold that the Government satisfied its duty.[6] The employees of the Manhattan VA did their level best to ensure that Mr. Boland would arrive in the Bronx VA admitting area: Nurse Cervini inscribed "Admitting" (as well as other particular information) on the envelope that accompanied Mr. Boland, and Mrs. Yates, after consultation with Miss Cervini, ordered a two-man ambulette because the patient was confused. Indeed, the latter measure demonstrated extra cautiousness on the part of the VA staff; Dr. Tershakovec testified that even a taxicab would have been a sufficient mode of transportation as long as the driver delivered Mr. Boland into the hands of the appropriate hospital staff. (Tr. 142–43) Furthermore, Mr. Grillo at the Bronx VA conducted a somewhat exhaustive search to locate Mr. Boland as soon as he learned of the patient's mysterious absence. We find that there was no further action the Government employees had to take to fulfill their duty of ensuring Mr. Boland's proper delivery.[7]

■ In contrast, Holmes, through its employee Capella, distinctly and overwhelmingly breached its duty of care to Mr. Boland.[8] Mr. Capella, insensitive, apa-

---

6. Since we find that the Government was not negligent, we need not address the liability in tort actions of the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, nor need we determine the applicability of the indemnification clause in the contract between the Government and Holmes.

7. Indeed, after a full trial on the question of liability, even the plaintiffs concluded (in their post-trial memorandum) that the Government was not negligent: "It is respectfully submitted that a review of the facts and testimony and exhibits in this case leads to the overwhelming conclusion that the personnel of Holmes Ambulance Company were solely liable for the death of Joseph Boland, and the consequences occur-

ring therefrom ..." (Plaintiffs' Summation at 2)

8. Holmes is vicariously liable for the negligence of its employee Capella under the *respondeat superior* doctrine. It is well established that an employer is liable for torts committed by his employee acting within the scope of employment. *See Brown v. Poritzky*, 30 N.Y.2d 289, 292, 332 N.Y.S.2d 872, 875, 283 N.E.2d 751, 753 (1972); W. Prosser, Law of Torts, § 70, at 460 (4th ed. 1971). Since Capella was an employee of Holmes and received instructions from the company's dispatcher to pick up Mr. Boland and drive him to the Bronx VA, his actions in carrying out the order were within the scope of his employment.

thetic and devoid of rudimentary common sense, left the patient unattended in the main lobby of the Bronx VA where, as any reasonable person would know (let alone a licensed ambulance driver) the hospital personnel had no reason to expect Mr. Boland's arrival or be aware of his presence at the area where he was "deposited," or his need for treatment. Revolting is the sure knowledge that the hospital personnel did not even receive the envelope with the word "Admitting" written across its face; that alone would have alerted them to Mr. Boland's situation. We conclude that Mr. Capella's callous conduct did not even begin to approach the standard of careful and safe delivery into the custody of personnel competent to attend to the patient. Accordingly, Mr. Capella breached his plain duty of care as did Holmes.

### 2. Proximate Cause

■ We must finally determine whether Mr. Capella's careless "depositing" of Mr. Boland in the main lobby was the proximate cause of the patient's death. As to this inquiry, the plaintiff bears the "burden to show that the defendants' conduct was a substantial causative factor in the sequence of events that led to [his] injury." *Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 520, 429 N.Y.S.2d 606, 614, 407 N.E.2d 451, 459 (1980). *See Derdiarian v. Felix Constr. Corp.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666, 670 (1980); *Koester v. State*, 90 A.D.2d 357, 457 N.Y.S.2d 655, 658 (4th Dept.1982); Restatement (Second) of Torts § 430; W. Prosser, Law of Torts § 42 (4th ed. 1971). If it is more probable than not that the defendant caused the injury-producing event to occur, proximate cause is established. *See Koester, supra,* 457 N.Y.S.2d at 658 (quoting Prosser, *supra,* § 41, at 242). Prosser has further (and wisely) advised that the absence or presence of proximate cause must be ascertained by the trial court "upon mixed considerations of logic, common sense, justice, policy and prece-

dent." § 42, at 249 (quoting Street, 1 Foundations of Legal Liability 110).

■ We experience no hesitancy whatever in concluding that Mr. Capella's negligence was a substantial cause of the series of occurrences that led to Mr. Boland's demise. Had Mr. Capella merely driven to the admitting room of the Bronx VA—the destination of all ambulettes and the area that was clearly demarcated on the government envelope accompanying Mr. Boland— the staff would have attended to the patient. Mr. Capella stated at his deposition that he knew the patient was in need of dialysis treatment and he believed the patient was very depressed. (Holmes Ex. C at 19–20) Surely this para-transit licensed ambulance driver could foresee that a person in Mr. Boland's condition, left alone and unattended, was apt to wander off, encounter and become the victim of any number of possible events if he were not delivered to hospital personnel who were in a position to take care of him. In light of the foreseeable consequences, we find that Mr. Capella's inexcusable action proximately caused Mr. Boland's tragic end.

By calling Mr. George Anton, the automobile driver who fatally hit the decedent, to the witness stand, Holmes unsuccessfully attempted to prove that the sole or partial cause of Mr. Boland's death was Mr. Anton's negligence. The sparcity of proof on that score alone warrants an unqualified dismissal of the concept. Although Mr. Anton settled with the estate and therefore was not sued and did not introduce any proof in defense of his nonliability, we are persuaded by his testimony that he did not drink any alcoholic beverages that day (Tr. 230), that he did not at any point see Mr. Boland (Tr. 226), and that there was nothing he physically could have done to avoid hitting the decedent. (Tr. 230) It is our positive conclusion that the substantial cause of the death was Mr. Capella's conduct; without his negligence, Mr. Boland would not have walked alone across the Major Deegan Expressway at midnight.

Plaintiffs further contend that the refusal of the telephone operator at Holmes on the evening of February 26, 1981 to contact Mr. Capella and learn where he had left Mr. Boland was a proximate cause of the death. We share the plaintiffs' abhorrence of the operator's insensitivity. However, as a matter of law, we are unable to find that she proximately caused Mr. Boland's death. There is no evidence that had she contacted Mr. Capella the decedent would have been found before the tragic event took place.[9]

In short, we declare that the negligence of Jose Ralph Capella was the substantial cause of Mr. Boland's death, and therefore Capella and Holmes are fully liable.

CONCLUSION

We hold on the established facts and the law applicable thereto that Mr. Capella and Holmes, through its employee Capella, breached its duty of care to the decedent and proximately caused his cruel death. We further hold that the Government did not breach its duty of care.

Accordingly, we dismiss the complaint insofar as it alleges liability on the part of the United States. We find Holmes and Mr. Capella wholly liable. As early as practical, we propose to hear and determine plaintiffs' claims on the issue of damages.

SO ORDERED:

---

**9.** Because we find no proximate cause in the operator's actions, we need not determine what standard of care she was required to satisfy.