■ BESTWAY CONSTRUCTION, INC., Appellant-Respondent, v BROOME COUNTY, Respondent-Appellant, and ROSE STONE & CONCRETE, INC., Respondent. — Cross appeals (1) from a judgment of the Supreme Court in favor of defendant Rose Stone & Concrete, Inc., entered April 4, 1983 in Broome County, upon a decision of the court at Trial Term (Lee, Jr., J.), without a jury, and (2) from a judgment of said court in favor of plaintiff, entered April 26, 1983 in Broome County, upon a decision of the court, without a jury.

On October 31, 1977, plaintiff, Bestway Construction, Inc. (Bestway), entered into a contract with defendant Broome County (the county) for the construction of a dam on the Nanticoke Creek. Defendant Rose Stone & Concrete, Inc. (Rose) subsequently was awarded a subcontract to supply the concrete for the dam. Funding for the project was furnished by the United States Department of Agriculture Soil and Conservation Service (SCS) under a contract with the county in which it was agreed that SCS would provide the project engineer and inspectors. SCS

also drew the concrete specifications which set forth minimum standards for the concrete regarding, *inter alia,* compressive strength, consistency (slump) and air content of the mix, and the methods for testing therefor by the inspectors. The specifications also required Bestway to submit a proposed design of the concrete components and their prospective proportions (the design mix) for the approval of the project engineer.

Actually, SCS project personnel participated in the testing to arrive at the proper design mix at the Rose plant even before the subcontract was awarded. Once the parties had agreed upon the design mix, it was anticipated that the proper batching of each truckload would be accomplished by means of the automated mixing process at the Rose plant. The correct proportions of raw materials were entered on a plastic card for insertion into a console which then automatically assembled the proper components and quantities according to the design mix for each truckload, and the console issued a computer printout of that data. The batch operator then added a fixed amount of water and wrote up a delivery ticket (as required by the specifications) identifying the delivery truck by number and setting forth the cubic yardage of concrete in the load and the respective quantities of the various materials. The batch operator also recorded on the delivery ticket the revolution counter reading on the delivery truck, since the specifications fix a minimum (70) and maximum (100) number of revolutions of the drum of the truck mixer before pouring.

Actual pouring at the job site began June 29, 1978 and continued in stages through July 19. The project engineer took cylinder specimens of the pour on July 11 for purposes of conducting seven-day compressive strength tests. When these tests showed a compressive strength of nearly 1,000 pounds per square inch (psi) less than the results of the seven-day test performed on the original design mix, SCS notified Bestway of concern over the quality of the concrete. Bestway nevertheless elected to proceed with pouring the final quantities of concrete on July 19, 1978. SCS notified the contractor that the 28-day compressive strength test required under the specifications would be conducted on the July 19 pour and offered Bestway the opportunity to take its own specimens for testing. Bestway declined. The concrete specifications provided two alternative methods of obtaining specimens for the 28-day strength test, each pursuant to the standards of the American Society for Testing and Materials (ASTM), i.e., using either cylinders taken from the pour or extracting core samples after the concrete set. Initially, SCS employed the cylinder method. However, when it

was discovered that the specimens had been exposed to temperatures in excess of the ASTM specifications, SCS notified Bestway and then employed the alternative, core-sample method of obtaining specimens for testing. Three cores were extracted from the area of the concrete riser of the dam, representing concrete from the same two trucks whose pours were used to obtain the cylinder specimens. Bestway was also invited to extract its own core samples for 28-day testing at the time, but did not do so until it subsequently took five specimen cores and had them tested at 38 days.

The results of the tests performed on the three SCS specimens reflected compressive strengths of 4,031, 3,487 and 2,446 psi, respectively, representing an average of almost 700 psi under that required by the specifications. Accordingly, the county, at the behest of SCS, instructed Bestway to remove and replace the riser with concrete meeting contract specifications. Bestway maintained that the concrete was adequate and treated the county's instruction as a change order for which it was entitled to additional compensation. Bestway submitted such a claim after complying with the direction to remove and replace the riser and, when the claim was rejected, brought the instant action.

Following a trial without a jury, Trial Term ruled in favor of Bestway and Rose and this appeal followed.

We reverse. The crucial determinations by Trial Term in its decision were that the county failed to show "that the concrete supplied * * * at the job site * * * was not adequate or failed to meet the specifications. The county through the inspectors took over the mixing operation". We find the record inadequate to support these conclusions. Undeniably, the 28-day tests performed on the three SCS cores revealed compressive strengths significantly below that required by the contract. Bestway did not seriously challenge the methodology for testing as being at variance with the appropriate ASTM specifications, nor did Trial Term so find. Instead, Bestway and Rose attempted to undermine the weight to be given these test results by: (1) introducing oral testimony that the contents of the pours in question conformed to the design mix; (2) submitting the test results of their own core samples showing a higher psi compressive strength; (3) contending that their test results were entitled to greater weight because they more randomly represented the strength of the concrete riser as a whole; and (4) offering expert testimony that the core having the lowest psi should have been eliminated from consideration and that core testing would in general show compressive strength 85% less than cylinder testing of the same concrete.

We find none of the above persuasive. Bestway and Rose principally relied upon the testimony of the batch operator at the Rose plant to prove that the loads in question had the same composition as the design mix. However his credibility was seriously impaired by documentary evidence showing substantial variations from the design mix recorded on the computer printouts for various loads, which he admitted altering by handwritten notations. And Bestway and Rose cannot at the same time both claim that the printouts demonstrated conformity of the deliveries to the design mix and explain discrepancies in the printouts as being merely due to typographical errors. Bestway's expert's contention that the lowest test result should be ignored was contrary to a provision of the specifications. The compressive strength test results from the cores extracted by Bestway were entitled to little weight. These tests were conducted some 10 days subsequent to the time for testing fixed in the specifications, despite Bestway's opportunity to obtain samples and test in a timely fashion. Moreover, Bestway's cores were obtained from areas of the riser different from that SCS identified as being weak, the latter being an area established as exposed to greater stress from physical forces in the operation of the dam. It was also noteworthy on this issue that a core extracted by Bestway from the *suspect* area of the riser was not tested for compressive strength, but was otherwise analyzed by Bestway's expert and found relatively inferior.

We likewise cannot agree with Trial Term's conclusion that SCS inspectors took over the mixing operation and that this somehow brought about the deficiencies in the strength of the concrete. Since the contract provided for on-site testing for slump and air content upon delivery and before pouring, the parties well understood that the inspectors would be involved in the on-site mixing process. The only competent proof of their undue interference came from the testimony of three of Rose's truck drivers, none of whom had actually delivered the loads for the specific concrete in issue in this litigation. The drivers' testimony that SCS personnel limited them to a minimum number of revolutions of the mixing drums and prevented agitation of the drums for extended periods while testing was being performed was rebutted by documentary evidence. In fact, the drum revolutions during the mixing of the loads they had delivered approached the maximum specified in the contract and the time lapse for testing of those loads was not nearly what they described. There was also a failure of proof that inspectors directed the addition of excessive water to the mix at the site. The inspectors had the right to and did rely on the quantities of water added at the plant, as set forth in the delivery tickets, in

calculating any further amounts that could have been added at the site. Thus, the credible evidence does not point to any interference by inspectors with the on-site mixing process beyond what was required of them in performing the tests specified in the contract. There likewise was an absence of proof competent to establish that the inspectors' conduct at the site adversely affected the strength of the specific concrete in question.

As the foregoing discussion demonstrates, the credible evidence supported alternative findings and inferences from those made by Trial Term. Therefore, this being a nonjury case, this court is permitted to weigh the relative probative force of conflicting testimony and strength of conflicting inferences and, on that basis, make alternative findings (*Koester v State of New York,* 90 AD2d 357, 363-364; *Shipman v Words of Power Missionary Enterprises,* 54 AD2d 1052, 1053). Here, the credible proof clearly points to the conclusion that the testing procedures employed by SCS were in all respects valid and that, in the area of the riser preeminently requiring strength, the concrete failed to meet contract requirements (cf. *McIntosh Ready Mix Concrete Corp. v Battaglini Corp.,* 36 AD2d 561). Having thus failed to prove performance of a significant condition of the contract, Bestway was not entitled to recover the costs of replacement of the riser as an extra. Clearly, the foregoing facts do not support any such recovery on the alternative theory of substantial performance (see *Lewis v Barsuk,* 55 AD2d 817, 818). Accordingly, the judgments in favor of Bestway and Rose must be reversed, and the matter remitted to Trial Term for a determination and appropriate findings with respect to Bestway's alternative claims against Rose for supplying defective concrete.

Judgments reversed, on the facts, with one bill of costs, and matter remitted to Trial Term for a determination and appropriate findings with respect to plaintiff's cause of action against defendant Rose Stone & Concrete, Inc. Main, J. P., Weiss and Levine, JJ., concur.

Mikoll and Yesawich, Jr., JJ., dissent in the following memorandum by Mikoll, J. Mikoll, J. (dissenting). We respectfully dissent.

The determination of the trial court was not against the weight of the evidence. Upon weighing the relative probative weight of the testimony and inferences to be drawn therefrom, this court should not change the judgment reached by the trial court. While the facts are disputed as to (1) the adequacy of the concrete supplied to meet the contract specifications, and (2) whether the county, through its inspectors, took over the mixing

operation as well as testing and directing the pour at the job site, there was ample evidence on which the trial court could resolve these two crucial issues to the benefit of Bestway and Rose.

There was testimony that supports the conclusion that SCS controlled the development of the design mix and that test cylinders extracted from the mix were excellent. The record discloses, too, that proper procedures were followed by Rose to insure the proper combination of materials. Also, there was evidence to support the conclusion that the batch of stone which the county contended had an improper amount of "#1 crushed aggregate" stone in relation to "#2 crushed aggregate" stone did, in fact, contain the correct amount of each type of stone. The trial court could properly find that the computer printout which read to the contrary contained a typographical error and that the handwritten delivery ticket instead reflected the correct amount of the type of stone in the batch. Further, the petrographic analysis of the mix supported the conclusion that good quality concrete was supplied.

We also find no error in the trial court's conclusion that the county so involved itself in the mixing and adding of water to the stone mix that it could not properly rely on the condition precedent of passing the strength test (see *McIntosh Ready Mix Concrete Corp. v Battaglini Corp.*, 36 AD2d 561).

The trial court concluded that the nonperformance of the condition was caused by the county. The evidence supports that finding. The instant circumstances fall squarely within the ambit of *McIntosh* (*supra*) and entitled Bestway and Rose to recover for the additional work and materials supplied, as found by the trial court. The factual determinations of the trial court should not be disturbed.