**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF PITTSBURGH; Wichita Federal Savings and Loan Association: City of Farmington, New Mexico; and Federal Savings and Loan Insurance Corporation, Plaintiffs,**

v.

**OPPENHEIM, APPEL, DIXON & CO., a partnership, Defendant.**

No. 85 Civ. 4163 (MEL).

United States District Court, S.D. New York.

Feb. 24, 1986.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for plaintiffs; of counsel: Harvey Kurzweil, David B. Howorth, Jonathan W. Miller, Neil Tublin.

Solinger Grosz & Goldwasser, P.C., New York City; of counsel: Dan L. Goldwasser, Lee S. Wasserman, Linda J. Pittleman, Vici L. Safran, Rosenfeld Parnell & Shames, Inc., Los Angeles, Cal.; of counsel: Edward M. Rosenfeld, Franklin R. Wurtzel, Roberta M. Klein, for defendant.

LASKER, District Judge.

Defendant Oppenheim, Appel, Dixon & Co. moves pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) to dismiss the complaint in this action for failure to state a claim upon which relief can be granted and for failure to plead the fraud claims with sufficient particularity. For the reasons explained below, the motion is granted in part and denied in part.

I.

The present action arises out of the complex of facts which formed the basis of a previous litigation before this court, *Wichita Federal Savings and Loan Association v. Comark*, 586 F.Supp. 940 (S.D.N.Y.). In that action five savings and loan associations and a municipality sued Comark, a dealer in government securities, and Marine Midland Bank, N.A. ("Marine"), Comark's clearing agent, for losses of $17 million in government securities sustained in June 1982.

The plaintiffs in the *Wichita* action were former customers of Comark who alleged

> that Comark represented to the plaintiffs that securities which they had purchased from Comark would be segregated in safekeeping accounts; that the securities were instead deposited and integrated in a Marine account with other securities owned either by Comark or by other customers; that Comark used the plaintiffs' securities as collateral for a loan from Marine; and that Marine sold the plaintiffs' securities to satisfy debts owed by Comark.

*Wichita Federal Savings and Loan Association v. Comark*, 586 F.Supp. 940, 942 (S.D.N.Y.1984). The *Wichita* action was tried to a jury in the spring of 1985, with the jury returning a verdict for fraud and the court directing a verdict for conversion against Comark. Plaintiffs settled their claims against Marine during the trial.

The plaintiffs in the present action are four of the five savings and loan associations or their successors in interest who were plaintiffs in the *Wichita* action and the City of Farmington, New Mexico.[1] In this action the plaintiffs seek to hold Comark's accountants, Oppenheim, Appel,

---

**1.** They are: First Federal Savings and Loan Association of Pittsburgh, which is the successor-in-interest of Security First Federal Savings and Loan Association; Wichita Federal Savings and Loan Association; Federal Savings and Loan Insurance Corporation, an assignee of all rights and interests of both Northwestern Savings and Loan Association (through its successor Roosevelt Federal Savings and Loan Associa-

tion) and Mutual Federal Savings and Loan Association (through its successor American Federal Savings and Loan Association); and the City of Farmington, New Mexico. References in the opinion to "plaintiffs" are intended to refer, depending on the context, to either the original savings institutions or the current parties to the litigation.

Dixon & Co. ("OAD"), liable on a variety of legal theories for the losses they incurred.[2]

The amended complaint, the factual averments of which must be accepted as true on this motion to dismiss, alleges that between July 1981 and May 1982 the plaintiffs purchased[3] securities through Comark which were left on deposit for safekeeping and deposited other securities for safekeeping with Comark. As part of its role as Comark's clearing agent during this period, Marine regularly made overnight loans to Comark to finance Comark's inventory positions in government securities. These overnight loans were covered by a security agreement under which Comark granted Marine a floating security interest in all securities in Comark's account at Marine that Comark owned or in which it had an interest. Although Comark had represented to plaintiff customers that their securities would be held in safekeeping, Comark deposited the plaintiffs' securities in an account at Marine with securities that Comark owned, thereby pledging or hypothecating plaintiffs' securities as collateral for the overnight clearance loans. From June 1981 forward Comark's overnight loans almost always exceeded the value of the securities held by Marine that were owned by Comark itself. From August 1981 forward Comark continued its operations insolvent, with its liabilities exceeding its assets. On June 3, 1982 Comark informed Marine of its financial problems and its pledging of customer-owned securities. Marine responded by foreclosing on its loans to Comark and on June 4, 1982 liquidated plaintiffs' securities, among others, in order to satisfy Comark's then outstanding overnight loan. Those securities had a value at the time of liquidation of over $16 million.

The amended complaint also alleges that as early as the summer of 1981 Comark

informed OAD and Stephen Rubenstein, the OAD partner in charge of the Comark account, about its financial problems and its pledging of customer-owned securities. Subsequently, Rubenstein together with employees of OAD and Comark engaged in an attempt (known as the Board Room Project) to reconcile Comark's records. The Board Room Project also specifically reviewed the accounts of Richard Tisdale, a Comark salesman whose customers included all but one of the plaintiffs. In late October 1981 Rubenstein prepared a memorandum (the "Illegal Acts Memo") (attached to Amended Complaint as Exhibits A & B) for OAD's national management committee in which he detailed Comark's difficulties and discussed OAD's disclosure obligations.

The amended complaint alleges three distinct instances of OAD's involvement in Comark's fraud and conversion:

> Throughout September and October, 1981 and ... continuously thereafter, Rubenstein and OAD advised Comark that Comark did not need to disclose to anyone that customer-owned securities were commingled or hypothecated with Comark's securities in one account at Marine.

> In December, 1981, Rubenstein met with Tisdale at Comark's offices in California and informed Tisdale that there would be no material problems with Comark's financial statement for the year ending December 31, 1981.

> [D]uring the course of its audit of Comark in January and February, 1982, OAD drafted, issued and mailed to plaintiffs, or caused to be drafted, issued and mailed to plaintiffs, letters on Comark stationery ... [representing] that Comark was holding their securities in safekeeping, and request[ing] that plaintiffs confirm directly to OAD their under-

---

**2.** Since the filing of the amended complaint, OAD has impleaded a number of third-party defendants: Marine Midland Bank, N.A.; E. Keith Owens; Robert Bell; S. Muir Atherton; Daniel Harkens; Richard Tisdale; John J. Giovannone; and the law firm of Memel, Jacobs, Pierno, Gersh & Ellsworth.

**3.** The amended complaint also alleges that some of the plaintiffs entered into repurchase and reverse repurchase agreements with Comark. Amended Complaint at ¶¶ 22, 25.

standing that such securities were being held in safekeeping.

Amended Complaint at ¶¶ 58, 61, 66.

The plaintiffs claim that as a result of this course of conduct OAD is liable for negligent misrepresentation (count II); fraudulent misrepresentation (count I); violation of the federal and New Mexico securities fraud statutes (counts III & IX); aiding and abetting and conspiracy to commit Comark's fraudulent misrepresentation, conversion and violation of the federal and New Mexico securities fraud statutes (counts VI, VII, IV, & X); and violation of the federal and New Mexico racketeering statutes (counts VIII & XI).[4] The plaintiffs seek in the aggregate compensatory damages of over $16 million (or treble damages on the racketeering causes of action) as well as punitive damages of $20 million. OAD moves to dismiss the entire complaint for failure to state any claim upon which relief can be granted.

## II.

### A. *Negligent Misrepresentation*

OAD argues that the complaint fails to state a claim for negligent misrepresentation by OAD because OAD owed plaintiffs no duty of care under the law of either New York or California. OAD adds that even if plaintiffs were owed a duty of care by OAD, OAD owed Comark a higher legal duty not to disclose without Comark's consent any information learned by OAD in the course of the accountant/client relationship.

The leading case in New York on the subject of accountants' liability for negligence to third parties absent privity of contract is *Credit Alliance Corporation v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985). In *Credit Alliance* the Court of Appeals

refined the privity rule of *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931) (Cardozo, C.J.), stating:

> Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Credit Alliance*, 65 N.Y.2d at 551, 493 N.Y.S.2d at 443, 483 N.E.2d at 118. The *Credit Alliance* opinion decided two cases. In the first, the court found that even though the accountants knew or should have known that their client was showing their financial reports to plaintiffs, creditors of the client, in order to induce their reliance on them, the complaint did not allege either a particular purpose for the reports' preparation or any word or action on the part of the accountants directed at the plaintiffs. *Id.* at 553–54, 493 N.Y.S.2d at 444, 483 N.E.2d at 119. In the second case, in contrast, the court found that the accountants were aware that the primary, if not exclusive, purpose of their audit of the client was to provide the plaintiff bank with the financial information it required, and that the accountants communicated with the bank orally and in writing and in person on numerous occasions. *Id.* at 554, 493 N.Y.S.2d at 445, 483 N.E.2d at 120. The court dismissed the negligence cause of action in the first case and found the complaint sufficient in the second.

---

4. Count V of the amended complaint alleges conspiracy with and aiding and abetting Comark in its violation of Section 25216 of the California Corporation Code and Rules 260.216.-8(a)(1), (a)(2) and (a)(3) promulgated thereunder. Plaintiffs submitted a letter on September 10, 1985, that indicated they had come to the conclusion that a claim under Section 25216 could be asserted only against Comark and not against OAD. Plaintiffs have never responded to OAD's motion to dismiss the California Corporation Code allegations. Accordingly, the motion to dismiss count V is granted.

■ Applying the *Credit Alliance* criteria to the facts in the case at hand, the motion to dismiss is denied. The financial reports in this case were the oral representations made by Rubenstein to Tisdale in December 1981 and the audit confirmation letters mailed to the plaintiffs in January and February of 1982. As to the conversation with Tisdale, the amended complaint alleges that Rubenstein knew or should have known that his statements were going to be relied on by Tisdale's customers—plaintiffs herein—and the complaint's allegations of Rubenstein's awareness of who Tisdale's customers were sufficiently pleads conduct by the accountant which evinces his understanding of the customers' reliance. Similarly, OAD was charged with the knowledge that Comark intended that the plaintiff customers to whom OAD mailed the audit reports would rely on the representations regarding safekeeping contained therein, and the act of sending such letters directly to the plaintiffs satisfies the conduct requirement. Thus, although the conduct linking OAD to the plaintiffs may not have been as direct as in the second *Credit Alliance* case decided by the New York Court of Appeals, the allegations of the amended complaint are sufficient to fulfill the second and third *Credit Alliance* criteria.

As to the first criterion—the accountants' awareness that their financial reports were to be used for a specific purpose—the amended complaint alleges that OAD was well aware of the purpose of its audit activities, namely, to investigate and rectify if possible Comark's insolvency and hypothecation of customer-owned securities. Moreover, in view of the complaint's allegation that by the end of October 1981 OAD knew that Comark's problems had not been solved, it is reasonable to conclude that the plaintiffs have adequately pleaded that OAD knew the particular purposes to which its reports were to be put. Consequently, the allegations in the amended complaint meet the first *Credit Alliance* criterion as well, and the plaintiffs have established that OAD was under a duty of care under New York law not to render negligent financial reports to them.[5]

The parties appear to agree that the fraudulent misrepresentation claim is governed by either New York or California law, in view of the fact that they devote virtually all of their briefs to a discussion of the law of those two jurisdictions. Because we read the New York law as imposing requirements for a negligence cause of action against accountants at least as stringent as the corresponding California law on the duty of care owed by a professional to a third party absent contractual privity,[6] an

---

**5.** OAD raises an additional argument regarding the significance of an audit confirmation letter as a basis for a finding of negligent misrepresentation under New York law. OAD points out that the *Credit Alliance* court had before it an amicus brief submitted by the New York State Society of Certified Public Accountants that described the audit confirmation process. OAD contends that the Court of Appeals, though fully aware that the accountants in that case mailed audit confirmation letters to the plaintiffs, declined to allow the complaint against the accountants to stand.

The inference that OAD would draw—that such audit letters can never help form the basis for liability under the *Credit Alliance* test—is not convincing, least of all in a case like this one in which the principal subject of such audit letters—safekeeping of customer securities—was so intimately related to the specific purpose for the client's retention of the accountants and so causally connected with the losses subsequently suffered by the plaintiffs.

**6.** California courts have long applied a somewhat broader approach than New York to the question of whether a professional, such as an accountant, owes a duty of care to a third party absent contractual privity.

> The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.

*Biakanja v. Irving*, 49 Cal.2d 647, 650, 320 P.2d 16, 19 (1958); *see also Lucas v. Hamm*, 56 Cal.2d 583, 589, 15 Cal.Rptr. 821, 824, 364 P.2d 685, 688 (1961) (holding that attorney could be liable in tort to beneficiaries of negligently

extended treatment of the California case law is not warranted. It suffices to state that by passing muster under the *Credit Alliance* standards, the plaintiffs' claim for negligent misrepresentation also states a cause of action against OAD under California law.

■ OAD's second argument—that it can not be liable for failing to disclose Comark's illegal activities to plaintiffs because it owed its client a higher legal duty not to disclose to its (Comark's) detriment information learned in the course of its accountant/client relationship without its client's consent—misses the mark. The amended complaint alleges facts which establish, for the purposes of a motion to dismiss, that OAD made *affirmative* negligent misstatements of fact, not merely that it failed to disclose certain facts. Certainly, once OAD communicated with the plaintiffs, it owed them a duty to speak truthfully.[7]

Accordingly, OAD's motion to dismiss the plaintiffs' claim of negligent misrepresentation is denied.

### B. *Fraudulent Misrepresentation*

OAD makes a number of arguments in support of its motion to dismiss the plaintiffs' common law fraudulent misrepresentation claim. OAD first contends that the allegations as to fraudulent misrepresentations in the amended complaint fail adequately to establish misstatement, materiality, scienter, and reliance—elements of common law fraud, and that the complaint fails in certain respects to state the circumstances of the alleged fraud with the particularity required by Fed.R.Civ.P. 9(b). With regard to the plaintiffs' allegations that OAD and Rubenstein advised Comark that it need not disclose the problems relating to the pledging of customer-owned securities, OAD's argument has merit.

■ A claim for common law fraudulent misrepresentation is sufficiently pleaded if the complaint alleges the misrepresentation of a material fact made with scienter that induces reliance to the detriment of the party to whom the misrepresentation is directed. *Fund of Funds, Limited v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1359 (S.D.N.Y.1982); *Van Alen v. Dominick & Dominick, Inc.*, 441 F.Supp. 389, 403 (S.D.N.Y.1976), *aff'd*, 560 F.2d 547 (2d Cir. 1977). OAD points out that the advice regarding non-disclosure alleged to have been given by Rubenstein and OAD to Comark was not a misrepresentation of fact, but rather an opinion as to Comark's legal obligations, and that reliance upon advice as to legal matters is unreasonable where the person intended to rely is aware that the advice comes from one not licensed to practice law. OAD also points out that Rubenstein had specifically directed Comark to consult counsel about the commingling problem, *see* Illegal Acts Memo at 6 (attached to Amended Complaint as Exhibit B), and thus he could not, as a matter of law, be chargeable with either knowledge or intent that Comark would rely on his legal advice. These considerations are persuasive that the plaintiffs' allegations contained in paragraph 58 of the amended complaint fail to satisfy the scienter and

---

drawn will) (considering also whether the imposition of liability would impose an undue burden on the profession), *cert. denied*, 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962); *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz*, 57 Cal. App.3d 104, 110–11, 128 Cal.Rptr. 901, 905–06 (Cal.Ct.App.1976) (attorney who issued legal opinion which was intended to secure a benefit for his client with the intention that it be transmitted to and relied upon by the plaintiff in dealing with the client held to owe plaintiff a duty of due care in providing the advice).

**7.** It should be noted moreover that given the allegations of OAD's awareness of Comark's insolvency, Comark's fraudulent hypothecation of its customers' securities, and the immediate danger of devastating financial losses plaintiffs risked by continued association with Comark, OAD may well have had a duty to disclose. It is an accepted proposition in the area of common law fraud that a claim for deceit based on a failure to disclose may be based on a defendant's knowledge that a plaintiff was acting under a reasonable, mistaken belief with respect to a material fact. *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 283 (2d Cir.1975); *Fund of Funds, Limited v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1359–60 (S.D. N.Y.1982).

reliance elements necessary to make out a claim of fraudulent misrepresentation,[8] and accordingly OAD's motion to dismiss is granted to the extent that it is based on the facts discussed immediately above.

■ As to the allegations regarding Rubenstein's representations to Tisdale about Comark's financial statement, OAD argues that the representations were not material and that the complaint fails to plead with particularity the elements of scienter and reliance. The Court of Appeals for the Second Circuit has defined a material fact as one to which a reasonable person would attach importance in determining his choice of action in a given transaction. *Securities and Exchange Commission v. Great American Industries, Inc.*, 407 F.2d 453, 459–60 (2d Cir.1968), *cert. denied sub nom. Pagnani v. Securities and Exchange Commission*, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969); *cf. TSC Industries v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). It is difficult to imagine what would be of more importance to plaintiffs (who faced decisions about purchasing and depositing securities with Comark) than the information that an intensive audit had by December 1981 revealed Comark to be insolvent and to be engaged in the regular pledging of its customers' securities, or the converse of such information, *i.e.*, that there were no problems. In any event, "materiality is a mixed question of law and fact … and a complaint may not properly be dismissed pursuant to Rule 12(b)(6) … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (1985).

OAD's contention that the allegations in the complaint are conclusory and incomplete and fail to satisfy the scienter and reliance elements is without merit. Rule 9(b) states that "intent, knowledge, and other condition of mind of a person may be averred generally," Fed.R.Civ.P. 9(b), and thus the allegations in the complaint suffice to establish for the purpose of a motion to dismiss that Rubenstein had reason to expect that Tisdale would inform his customers that there would be no problems with the financial statements. Reliance by the plaintiffs may be inferred from the allegations in the amended complaint that Tisdale was informed by Rubenstein, Comark's chief independent auditor, that there would be no problems with Comark's financial statement and that he informed his customers of the substance of the communication. Rule 9(b) requires no more than that each defendant be given notice of exactly what he is charged with, *Goldman*, 754 F.2d at 1069–70, and, as indicated above, the complaint here fulfills that obligation.

■ OAD also challenges the sufficiency of the claim of fraudulent misrepresentation with respect to the mailing of audit confirmation letters. OAD contends that the audit confirmation letters were not representations at all, were not made by them, and were not material. In the first place, the audit confirmation letters (attached to Amended Complaint as Exhibits C–G) are not merely, as OAD argues, requests for information directed to the plaintiffs. Although the letters do indeed seek confirmation, it is confirmation of an affirmative representation which is sought. When a letter states, "[W]ould you please confirm directly to our auditors … that the attached statements are a complete and accurate record of … all securities we are holding for you in safekeeping," Amended Complaint at Exhibit C, it is impliedly, but effectively, representing that the writer or sender believes the securities are indeed being held in safekeeping. Second, although the letters were typed on Comark stationery and signed by a Comark official, the amended complaint alleges that "OAD

---

**8.** Plaintiffs' brief opposing the motion to dismiss does not respond to OAD's arguments in this regard.

drafted, issued and mailed ... or caused to be drafted, issued and mailed to plaintiffs" these letters. Finally, OAD's argument that any "safekeeping" statements were not materially misleading because, although Comark's and its customers' securities may have been commingled, Marine's security interest did not extend to the customer's property is at best a mixed question of fact and law not susceptible to decision on a motion to dismiss.

In sum, the allegations contained in paragraphs 61 and 66 of the amended complaint satisfy the first four elements of common law fraud. OAD, however, also attacks the fraudulent misrepresentation claim on the ground that the plaintiffs fail to allege a sufficient causal relationship between the misrepresentations and plaintiffs' losses— the fifth element required to make out a cause of action in fraud. OAD advances essentially two arguments in this regard: (1) that OAD's alleged fraud could not as a logical matter have caused plaintiffs' injury and (2) that Marine's seizure of plaintiffs' securities constituted an intervening cause which prevented OAD's alleged fraud from being a substantial cause of the events which produced the injury.

OAD's first argument is that even if OAD had informed plaintiffs and other Comark customers of the commingling problem and they had sought to withdraw their securities, "there is no reason to believe that Marine would have responded in any way other than it did on June 4, 1982." Memorandum of Law in Support of Motion to Dismiss the Amended Complaint at 31. This argument is flawed in two respects. First, it is premised on factual assumptions by OAD that lie wholly outside the pleadings. On the contrary, it is the plaintiffs' suggestion that they would have removed their securities from Comark's control had they learned of the fraud before June 3, 1982 that should control here. A complaint should not be dismissed for failure to state

a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The other flaw in OAD's theory is that even if its factual assumptions were correct—that is, any security once entrusted to Comark was lost—had plaintiffs learned of the fraud at any time prior to May 19, 1982 they would at least have refrained from depositing additional securities for safekeeping with Comark.[9]

■ OAD's second causation argument also fails. OAD is correct in asserting that under New York law "an intervening intentional or criminal act will generally sever the liability of the original tort-feasor," *Kush v. City of Buffalo*, 59 N.Y.2d 26, 33, 462 N.Y.S.2d 831, 835, 449 N.E.2d 725, 729 (1983), but "[t]hat doctrine has no application when the intentional or criminal intervention of a third party or parties is reasonably foreseeable." *Id.* It is beyond peradventure that, on the facts alleged in the amended complaint, OAD occupied a position of skill and detailed knowledge about Comark's difficulties such that Marine's subsequent actions were reasonably foreseeable as the natural consequence of the circumstances OAD is alleged to have prolonged, if not created. Thus, Marine's seizure of plaintiffs' securities was not a superceding cause which would relieve OAD of liability. The question then boils down, under New York law, to whether the plaintiffs' injuries could, as a matter of law, be proven to have been proximately caused by OAD's fraud. *See Cable v. Hechler*, 532 F.Supp. 239, 245 (E.D.N.Y.1981) (applying New York law), *aff'd mem.*, 685 F.2d 423 (2d Cir.1982); 24 N.Y.Jur. *Fraud and Deceit* § 196 (1962). Once the plaintiff establishes that the defendant's conduct was a "substantial causative factor" in the sequence of events that led to the

---

**9.** OAD has submitted with its motion to dismiss a table which indicates that between February and May of 1982—a period subsequent to the mailing of the audit confirmation requests and the communication between Rubenstein and Tisdale—plaintiffs deposited with Comark securities valued at the time of their June liquidation by Marine at over $7 million. Appendix A to Memorandum of Law in Support of Motion to Dismiss the Amended Complaint.

injury, proximate cause presents a question for the trier of fact. *Koester v. State,* 90 A.D.2d 357, 361–62, 457 N.Y.S.2d 655, 658–59 (4th Dept.1982) (sufficient to meet the threshold that facts and circumstances are shown from which causation may be reasonably inferred). Cases in which causation is decided as a matter of law, however, are usually only those involving independent intervening acts, and such acts "may not serve as a superceding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders the actor['s conduct tortious]." *Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 315–17, 434 N.Y.S.2d 166, 170, 414 N.E.2d 666, 671 (1980). The plaintiffs in this case have sufficiently pleaded facts establishing proximate cause to withstand a motion to dismiss.

Accordingly, OAD's motion to dismiss the fraudulent misrepresentation claim is denied.

## C. *Securities Fraud*

■ OAD also moves specifically to dismiss the amended complaint's allegations of securities fraud. The plaintiffs claim that OAD's fraudulent misrepresentations violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1982); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982); Rule 10b–5, 17 C.F.R. § 240.10b–5 (1982); and New Mexico Statutes Annotated § 58–13–39.[10]

In order to state a claim of securities fraud, plaintiffs must, in addition to establishing the elements of common law fraud, *see Fund of Funds,* 545 F.Supp. at 1352—plead several special elements. Though these elements have been described in a number of ways, they include at a minimum: (1) that the mails or other means of interstate commerce or the facilities of a national securities exchange must have been used to facilitate the fraud; (2) that the plaintiff must have been a purchaser or seller of securities; (3) that the fraud must have been committed in connection with the plaintiff's purchase or sale; and (4) that the defendant's fraud must have been the cause in fact of plaintiff's injury. *See, e.g., Pross v. Baird, Patrick & Co., Inc.,* 585 F.Supp. 1456, 1458 & n. 1 (S.D.N.Y.1984) (Section 10(b) and Rule 10b–5)); *Kimmco Energy Corp. v. Jones,* 603 F.Supp. 763, 766 (S.D.N.Y.1984) (same).[11]

There is no dispute that jurisdictional means were used to accomplish the transactions alleged in the amended complaint. However, OAD argues that none of the other elements have been met. That is, it is their position that plaintiffs were not for purposes of the relevant transactions purchasers or sellers of securities, that the alleged fraud was not committed in connection with any purchase or sale by the plaintiffs, and that the alleged fraud did not cause plaintiffs' injuries.

---

**10.** Only the City of Farmington makes a securities fraud claim under the New Mexico statute. Amended Complaint at ¶ 104.

The parties do not include in their briefs any specific arguments on the New Mexico statute; nor do they in any way distinguish in their federal securities law discussion among the different federal provisions that are alleged to have been violated. They thus appear to agree that their treatment of the securities fraud issues applies equally to all of the alleged state and federal claims. The parties' arguments will be considered accordingly. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 60 n. 2 (2d Cir.1985).

**11.** Cases which state the elements for a Section 10(b)/Rule 10b–5 claim are relevant for Section 17(a) as well. The Court of Appeals for the Second Circuit has held that the connection and

causation standards derived from the "in connection with" language of Section 10(b) are no more stringent than those imposed by Section 17(a)'s requirement that the fraud be "in" the offer or sale of securities. *See Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 941–42, 944–45 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *cf. United States v. Naftalin,* 441 U.S. 768, 773 n. 4, 99 S.Ct. 2077, 2081–82 n. 4, 60 L.Ed.2d 624 (1979) ("[W]e are not necessarily persuaded that 'in' is narrower than 'in connection with.'")

The New Mexico statute closely tracks the language of Rule 10b–5, except for the absence from the statute of a jurisdictional act requirement. *Compare* N.M.Stat.Ann. 58–13–39(a) *with* 17 C.F.R. § 240.10b–5. Consequently, the elements of a Rule 10b–5 cause of action are assumed to be applicable to a New Mexico securities claim as well.

### standing

■ In analyzing the issues just raised, it is helpful to note those transactions which cannot serve to fulfill the standing requirement for maintaining a securities fraud action, namely, that a plaintiff be a purchaser or seller of a security. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). First, the transfers of almost $7 million of securities that are claimed to have been merely deposited with—as opposed to purchased from—Comark do not establish a purchase or sale. These transactions were no more than bailments. *See Rich v. Touche Ross & Co.*, 415 F.Supp. 95, 99 (S.D.N.Y.1976). *Securities and Exchange Commission v. Scott Gorman Municipals, Inc.*, 407 F.Supp. 1383, 1387 (S.D.N.Y.1975), cited by the plaintiffs, is not to the contrary since the ruling in that civil enforcement action did not reach the issue of a private litigant's standing to sue. *See Securities and Exchange Commission v. National Securities, Inc.*, 393 U.S. 453, 467 n. 9, 89 S.Ct. 564, 572 n. 9, 21 L.Ed.2d 668 (1969).

Nor would it avail the plaintiffs to argue that their retention of the securities constituted a purchase or sale. The only exception to the rule that mere retention does not amount to a purchase or sale has been "limited to those situations where the plaintiffs signify to the defendant their present intention to sell their shares and are specifically induced thereafter by a fraudulent scheme to retain their shares." *Rich v. Touche Ross & Co.*, 415 F.Supp. at 100; *see Bolger v. Laventhol, Krekstein, Horwath & Horwath*, 381 F.Supp. 260, 266 (S.D.N.Y. 1974). The amended complaint contains no such allegation.

■ Plaintiffs argue that Comark pledged their securities on a daily basis from the summer of 1981 through June 3, 1982, and that each time a security was pledged a "sale" of that security occurred. This argument also fails. It is true that it is now an accepted proposition that the pledge of a security constitutes a sale for the purposes of the antifraud provisions of the federal securities laws. *Marine Bank v. Weaver*, 455 U.S. 551, 554 n. 2, 102 S.Ct. 1220, 1222 n. 12, 71 L.Ed.2d 409 (1982); *Rubin v. United States*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). However, in the case at hand the plaintiffs are neither pledgors nor pledgees of the securities involved: the amended complaint alleges only that Comark pledged them to Marine. Consequently, it is only with respect to their own actual *purchases* (or sales, if any) of securities from Comark that plaintiffs have standing to assert securities fraud claims against OAD.

### connection and causation

■ OAD contends that even as to the plaintiffs' actual purchases, the allegations in the amended complaint fail to satisfy the "in connection with" and causation requirements for a securities fraud claim. They argue, first, that only those of plaintiffs' securities purchases that occurred subsequent to the alleged fraudulent misrepresentations by OAD can be "in connection with" such fraud. This argument has merit. To meet the "in connection with" requirement, the "fraud practiced must have been prior to or contemporaneous with the sale of securities." *Freschi v. Grand Coal Venture*, 551 F.Supp. 1220, 1227 (S.D.N.Y. 1982) (quoting *Kogan v. National Bank of North America*, 402 F.Supp. 359, 361 (E.D.N.Y.1975)); *see also Eisenstadt v. Josephthal & Co.*, [1984–85 Transfer Binder] Fed.Sec.L.Rep. ¶ 91,971 at 90,845 (S.D.N.Y. 1985) (July 29 fraudulent representation was not made in connection with July 28 forced sale of stock because sale *"preceded"* alleged misrepresentation). Thus, the plaintiffs cannot state a claim for securities fraud with respect to any purchases made before the alleged December 1981 representations by Rubenstein to Tisdale.

Second, OAD argues that even with respect to those purchases that occurred after its alleged fraud, the plaintiffs' allegations fail to meet the connection and causation requirements, which are two criteria judicially developed to analyze a claim so as to ensure that the fraud alleged is suffi-

ciently bound up with the securities transaction to merit consideration under the federal statute.

In *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), the Supreme Court considereed a case in which the stock of a company was purchased with its own assets, a fraudulent scheme made possible by the misappropriation of the proceeds of the sale of the company's government bonds. The lower court had found no Section 10(b) violation because, in its words, "the purity of the security transaction and the purity of the trading process were unsullied." 430 F.2d 355, 361 (2d Cir.1970). The Supreme Court responded:

> To be sure, the full market price was paid for those bonds; but the seller was duped into believing that it, the seller, would receive the proceeds.
>
> . . . .
>
> Section 10(b) must be read flexibly, not technically and restrictively. Since there was a "sale" of a security and since fraud was used "in connection with" it, there is redress under § 10(b). . . .
>
> . . . .
>
> The crux of the present case is that [the company] suffered an injury as a result of deceptive practices touching its sale of securities as an investor.

404 U.S. at 9, 12–13, 92 S.Ct. at 167, 169. Subsequent decisions within this circuit have applied the broad "touch" test enunciated in *Superintendent. See, e.g., Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811 (2d Cir.1975) (purpose of accountants' certification of false financial statements of investment fund/advisor was to induce investors to buy and sell securities through fund/advisor which was manipulating such securities).

The "in connection with" requirement was applied by the court in *Securities and Exchange Commission v. Scott Gorman Municipals, Inc.*, 407 F.Supp. 1383 (S.D.N.Y.1975), a case cited by plaintiffs and quite similar on its facts to the instant case. In *Scott Gorman* a securities dealer who used customer securities as collateral for clearing loans after telling customers and salesmen that such securities were being held in safekeeping was found to have violated Sections 17(a) and 10(b) in the context of an SEC injunction proceeding. In response to these decisions OAD cites *Rich v. Touche Ross & Co.*, 415 F.Supp. 95 (S.D.N.Y.1976), in which the district court held that accountants' fraudulent misrepresentations as to the financial condition of a brokerage firm that was later liquidated were not in connection with customers' securities purchases since the fraud did not induce particular purchase transactions but rather had the result of inducing the customers to keep their securities in the custody of the brokerage firm.

Recent cases in this circuit analyzing securities fraud allegations have emphasized the need to prove that the alleged fraud was more than a "but for" cause of the plaintiff's loss. The leading case in this area, and the case upon which OAD primarily relies in its papers, is *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). There the complaint alleged that the defendant accountants had knowingly furnished the plaintiff banks with false information about Frigitemp Corporation, that the banks had relied on the information in deciding to renew loans to Frigitemp and make a new loan to a Frigitemp subsidiary, that the loans were secured by Frigitemp's guarantee and a pledge of the subsidiary's stock, and that the banks suffered losses when Frigitemp went bankrupt. The Court of Appeals, by Judge Friendly, held that the relevant security involved in the transaction was the pledge of the subsidiary's stock and framed the controlling issue as whether misrepresentations involved in a securities transaction but not pertaining to those securities themselves (the accountants were not alleged to have made any misrepresentations about the subsidiary) could form the basis for a violation of Sections 17(a) and 10(b) and Rule 10b–5. *Id.* at 943. Deciding that

there was no basis for liability, the court observed:

> [The banks'] showing is simply that but for Andersen's description of Frigitemp they would not have renewed the Frigitemp loans or made the ... loan [to the subsidiary] which Frigitemp guaranteed, and if they had not done this, there would have been no pledge of [the subsidiary's] stock. Such "but for" causation is not enough. The Act and Rule impose liability for a proscribed act in connection with the purchase or sale of a security; it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part.
>
> ....
>
> It would be anamalous to hold that commercial bank loans procured by fraud are generally not within § 10(b) and Rule 10b–5, but that they become so, even though of a sort that no one would have considered to constitute a security, if collateralized with a security, although no misrepresentation was made with respect to the latter.

*Id.* at 943–44 (footnote omitted). Other decisions in this circuit continue to apply the loss causation analysis in dismissing securities fraud claims. In *Bennett v. United States Trust Company,* 770 F.2d 308 (2d Cir.1985), the court stated:

> In order to recover under section 10(b), a plaintiff must establish that the misrepresentation complained of caused the injury suffered. To establish causation, the plaintiff must show "both *loss causation*—that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the [plaintiff] to engage in the transaction in question." *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

*Id.* at 313. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61–62 (2d Cir.1985) ("Even if we were to adopt the broadest interpretation of 'in connection with' ... the Trustee's complaint ... must still fail because of the causation requirement...."); *Securities and Exchange Commission v. Drysdale Securities Corporation,* 606 F.Supp. 295 (S.D.N.Y.1985) (applying *Chemical Bank* in dismissing complaint against accountant alleged to have made fraudulent misrepresentations about broker-dealer's financial condition but not about fraudulent securities transactions); *but see Chemical Bank,* 726 F.2d at 945–47 (Van Graafeiland, J., dissenting); *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 708–10 (2d Cir.) (causation requirement met where broker trainee's misrepresentations about his status as specialist induced purchase and retention of securities in reliance on his expertise), *cert. denied sub nom. Wood Walker & Co. v. Marbury Management, Inc.,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980).

The facts alleged in the instant case do not lend themselves to easy classification under the decisions applying connection and causation principles. For example, the alleged fraudulent misrepresentations by OAD which are claimed to have induced the plaintiffs' subsequent securities purchases could arguably be considered so nearly contemporaneous with Comark's fraudulent conversion of those securities that they come within the holding of *Superintendent* as to connection. However, even based on the amended complaint's allegation of *daily* repledging of customer-owned securities, it would not be accurate to state that the plaintiffs here, like the plaintiff company in *Superintendent,* never actually received the proceeds of their securities transactions.

■■■ As to the application of the loss causation requirement, the facts of this case present a more difficult question than those in *Chemical Bank.* OAD's alleged misrepresentations did not relate only to the financial condition of Comark, with a securities transaction occupying only an incidental place in a larger fraudulently induced transaction. Rather, the amended complaint alleges that the misrepresentations went to the very fraud that later

resulted in the loss of plaintiffs' securities, and the direct purchases of securities from Comark constituted the entire fraudulently induced transaction.

Ultimately, however, the analyses of causation and connection contained in the cases boil down to a question of degree of proximity between the securities fraud alleged and the harm suffered. As discussed above, the securities fraud in this case could only have been OAD's alleged fraudulent inducement of the plaintiffs' direct purchases of securities from Comark. The distance to be assessed, then, is between the purchases and the losses. Whether as a conceptual or a mechanical matter, the separation between the purchases and the harm is too great to support a cause of action for securities fraud, at least as to OAD's primary liability. Conceptually, the purchases of the securities were acts distinct from their hypothecation even if both were alleged to be part of one fraudulent scheme. Mechanically, the securities purchases were completed *bona fide* trades for full value (the amended complaint makes no allegations to the contrary) and the plaintiffs' ownership was not impaired until Comark's next pledging of securities to Marine. In fact, the ultimate loss of the securities is not alleged to have occurred until June 4, 1982—remote in time by some months from many of the purchases.

Accordingly, the motion to dismiss the securities fraud claims is granted.

### D. *Aiding and Abetting*

The plaintiffs assert a number of secondary liability claims against OAD. The amended complaint alleges in count IV that OAD conspired with and aided and abetted Comark in its violations of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5, as well as Sections 8(b) and 15(c)(1) of the Exchange Act, 15 U.S.C. §§ 78h(b) and 78o(c)(1) (1982), and Rules 8c–1 and 15c1–2, 17 C.F.R. §§ 240.8c–1 and 240.15c1–2 (1982); count VI alleges that OAD conspired with and aided and abetted Comark in its common law fraudulent misrepresentation; count VII alleges that OAD conspired with and aided and abetted Comark in its conversion; count X alleges that OAD aided and abetted Comark in its violation of New Mexico Statutes Annotated § 58–13–39.[12]

OAD attacks the aiding and abetting and conspiracy claims on three grounds: (1) OAD did not substantially assist Comark's federal securities fraud; (2) there is no civil cause of action for aiding and abetting at common law; (3) the amended complaint fails to allege facts supporting any alleged conspiracy between OAD and Comark.

#### *substantial assistance*

In a case such as this, there are three prerequisites to aiding and abetting liability: the existence of a securities law violation by a primary wrongdoer, knowledge of the violation on the part of the aider and abettor, and substantial assistance by the aider and abettor in the achievement of the primary violation. *IIT, An International Investment Trust v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980). For the purposes of this motion, OAD apparently concedes that the amended complaint adequately alleges underlying securities violations by Comark[13] and OAD's awareness of such wrongdoing. OAD argues, however, that the plaintiffs have failed to assert any actions by OAD which constitute substantial assistance. This ar-

---

**12.** Only the City of Farmington makes an aiding and abetting claim under the New Mexico securities fraud statute. *See supra* note 10.

**13.** Neither party includes in its briefs any discussion regarding Comark's primary violation of Section 17(a) of the Securities Act, Sections 8(b) and 15(c)(1) of the Exchange Act or Rules 8c–1 and 15c1–2 promulgated thereunder, as alleged in the amended complaint at paragraph 81. Because there is some doubt as to whether a private right of action may be implied under one or all of the foregoing provisions and because the existence of a private right of action would seem to be required for a private party to state an aiding and abetting claim, our decision on the motion to dismiss refers only to that portion of count IV that premises liability on Section 10(b) of the Exchange Act and Rule 10b–5.

gument flies in the face of the amended complaint, which alleges that Rubenstein assured Tisdale that there would be no problems with Comark's financial statement and that OAD prepared and sent or caused to be prepared and sent to the plaintiffs audit confirmation letters containing misrepresentations about the safekeeping of their securities. Even the allegation in the amended complaint that OAD advised Comark that it did not need to disclose its hypothecation of customer-owned securities, while perhaps not sufficient to support a claim of fraudulent misrepresentation standing alone, may in combination with the other acts charged to OAD constitute substantial assistance. These alleged actions had the cumulative effect of helping to prevent the plaintiffs and others from discovering Comark's fraud and thus were a substantial cause of the perpetuation of Comark's fraud. *See Rolf v. Blyth, Eastman, Dillon & Co., Inc.,* 570 F.2d 38, 48 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

That Comark's commingling of customer securities began without OAD's knowledge or participation and might have continued even without OAD's assistance, as OAD contends, does not mean that plaintiffs have not adequately pleaded substantial assistance. *See IIT,* 619 F.2d at 925. Finally, OAD's reference to cases discussing the question of whether and in what circumstances inaction or failure to disclose may constitute substantial assistance are inapposite, since the amended complaint adequately alleges affirmative acts by OAD. Accordingly, OAD's motion to dismiss the aiding and abetting claims as to securities fraud is denied.

#### common law aiding and abetting

■ OAD's contention that there is no separate civil cause of action for aiding and abetting a tort at common law is belied, at least in this district, by several decisions recognizing the existence of a cause of action for aiding and abetting common law fraud. *See Aeronca, Inc. v. Gorin,* 561 F.Supp. 370, 375–76 (S.D.N.Y.1983); *In Re Investors Funding Corporation Securities Litigation,* 523 F.Supp. 533, 545–46 (S.D.N.Y.1980); *Kingstone v. Oceanography Development Corporation,* [1978 Transfer Binder] Fed.Sec.L.Rep. ¶ 96,387 at 93,349 n. 9 (S.D.N.Y.1978). These opinions contain little discussion of the issue, however, and although there is no contrary Second Circuit authority, the question is not free from doubt. Nevertheless, because keeping the common law aiding and abetting claims in the case will not require proof of any additional facts at trial, the motion to dismiss the claims of aiding and abetting common law fraud and conversion is denied.

#### common law conspiracy

■ OAD argues that the amended complaint fails to allege sufficient facts to support claims that OAD conspired with Comark to accomplish its fraud and conversion. Although New York law does not recognize an independent tort of civil conspiracy, *Burns Jackson Miller Summit & Spitzer v. Lindner,* 88 A.D.2d 50, 72, 452 N.Y.S.2d 80, 93 (2d Dept.1982), *aff'd,* 59 N.Y.2d 314, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983), it does recognize such allegations for the purpose of connecting non-actors, who might otherwise escape liability, with the acts of their co-conspirators. *Id.* at 72, 452 N.Y.S.2d at 93–94 (citations omitted); *accord Grove Press, Inc. v. Angleton,* 649 F.2d 121, 123 (2d Cir.1981). To plead conspiracy, plaintiffs must allege an agreement between two or more persons to accomplish an unlawful purpose, their intentional participation in the furtherance of the plan or purpose, and the resulting damage. *See, e.g., Vom Lehn v. Astor Art Galleries, Ltd.,* 86 Misc.2d 1, 7, 380 N.Y.S.2d 532, 538 (Sup.Ct. Suffolk Co. 1976). OAD points out the absence from the amended complaint of any allegations of an agreement between Comark and OAD and argues that the conspiracy claims must therefore be dismissed. The lack of an express allegation of an agreement is not fatal to the plaintiffs' conspiracy claims. The courts have held that disconnected acts, when taken together, may satisfacto-

rily establish a conspiracy, *Interstate Cigar Co. v. I.B.I. Security Service, Inc.*, 105 Misc.2d 179, 185, 431 N.Y.S.2d 1016, 1020 (Sup.Ct.Sp.T. Nassau Co. 1980) (citing *Keviczky v. Lorber*, 290 N.Y. 297, 302, 49 N.E.2d 146, 148 (1943)), and "[i]n most cases, in fact, courts infer a conspiracy from indirect evidence," *Rich-Taubman Associates v. Stamford Restaurant Operating Company*, 587 F.Supp. 875, 879 n. 5 (S.D.N.Y.1984). The plaintiffs' allegations as to Comark's fraud and conversion, the intimate business relationship between Comark and OAD, OAD's knowledge of Comark's unlawful acts, and the nature of OAD's misrepresentations constitute sufficient facts from which a trier of fact could infer an agreement. Accordingly, OAD's motion to dismiss the conspiracy claims is denied.

### E. *Racketeering*

Plaintiffs allege in counts VIII and XI respectively that OAD has violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68 (1982),[14] and the New Mexico Racketeering Act, N.M.Stat.Ann. 30–42–1 to 6.[15] OAD moves to dismiss these claims on the grounds that the amended complaint fails adequately to allege (1) any predicate RICO offense; (2) a pattern of racketeering activity; (3) an enterprise; (4) a RICO conspiracy.

### predicate acts

■ With respect to the required allegations of predicate acts, the plaintiffs assert in the amended complaint that OAD engaged in violations of the mail fraud statute (18 U.S.C. § 1341), the wire fraud statute (18 U.S.C. § 1343), and the antifraud provisions of the federal securities laws (*see* 18 U.S.C. § 1961(1)(D)). The allegations regarding the mailing of audit confirmation letters containing false state-

ments are sufficient to establish for RICO pleading purposes the commission of a predicate act of mail fraud pursuant to 18 U.S.C. § 1961(1)(B). The allegations in the amended complaint, discussed in detail above, are sufficient to plead the elements of a mail fraud offense. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir.1970) (use of the mails, intent to defraud, scheme to defraud). Moreover, contrary to OAD's contentions, the plaintiffs have alleged acts of mail fraud with sufficient particularity to satisfy the dictates of Fed.R.Civ.P. 9(b).

■ As to the alleged acts of wire fraud and securities fraud, OAD's argument has some merit. Nowhere in the amended complaint do the plaintiffs allege that OAD made use of wires to perpetrate a fraud, other than the general allegation in the final paragraph of the "Factual Averments" section of the amended complaint that "[t]he mails and means and instrumentalities of interstate commerce were employed in connection with all of the above transactions." Amended Complaint at ¶ 73. This language is insufficient to notify OAD of what use of the wires plaintiffs claim it made. Accordingly, the motion to dismiss is granted (to the extent it is based on predicate acts of wire fraud) without prejudice to repleading within 15 days of the filing of this Memorandum if such allegations can be made in good faith.

■ OAD is also correct, in light of the holding above that the plaintiffs have not stated a claim for securities fraud against OAD, that OAD has not directly violated the antifraud provisions of the federal securities laws. However, Section 1961(1) of RICO defines "racketeering activity" as "any offense involving ... fraud in the sale of securities." 18 U.S.C. § 1961(1)(D). The phrase, "any offense involving," has been held to be broad enough to include as

---

**14.** The plaintiffs specifically allege violations of Sections 1962(b), 1962(c), and 1962(d).

**15.** Only the City of Farmington alleges a violation of the New Mexico racketeering statute. It appears, based on the absence from the briefs of

any specific discussion of the New Mexico statute, that the parties agree that their discussion of the federal RICO claim should govern the state claim as well. The parties' arguments will be treated accordingly. *See supra* note 10.

a predicate act of racketeering a conspiracy to commit the offenses enumerated in Section 1961(1)(D), including securities fraud. *See United States v. Ruggiero,* 726 F.2d 913, 918–19 (2d Cir.), *cert. denied sub nom. Rabito v. United States,* —— U.S. ——, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *United States v. Weisman,* 624 F.2d 1118, 1123–24 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980). "Aiding and abetting" such offenses would also suffice as a predicate act. *See* 18 U.S.C. § 2 (1982); *see also Fireman's Fund Insurance Company v. Plaza Oldsmobile Ltd.,* 600 F.Supp. 1452, 1456 n. 2 (E.D.N.Y. 1985). Consequently, since the plaintiffs have stated a claim for conspiracy with and aiding and abetting Comark in its securities fraud violations, they have adequately alleged a predicate offense involving securities fraud.

### pattern

OAD next argues that the plaintiffs have failed to allege a pattern of racketeering activity, a requirement for any claim under 18 U.S.C. § 1962(b) or (c). A "pattern of racketeering activity" is defined by the statute as requiring at least two predicate acts committed within ten years of each other. 18 U.S.C. § 1961(5). The Supreme Court has recently stated in *dicta* that

> while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." ... Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e).

*Sedima, S.P.R.L. v. Imrex Company, Inc.,* —— U.S. ——, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

OAD contends that the amended complaint does not allege a pattern of racke-

teering activity because, even assuming *arguendo* that the representation by Rubenstein to Tisdale and the mass mailing of the audit confirmation letters to plaintiffs each constituted a predicate RICO offense, the mailing of the audit letters constitutes only a single predicate offense and the Rubenstein representation and the audit mailing are too isolated and unrelated to form a pattern. Both contentions fail.

■ First, the plaintiffs have alleged that the audit confirmation letters were mailed to them separately and on three separate days and referred to different securities holdings. Even when separate mailings arise out of a single scheme to defraud, the courts have considered each act of mail fraud as a separate predicate RICO offense. *United States v. Weatherspoon,* 581 F.2d 595, 601–02 (7th Cir.1978); *United States v. Beatty,* 587 F.Supp. 1325, 1328–29 (E.D.N.Y.1984); *Beth Israel Medical Center v. Smith,* 576 F.Supp. 1061, 1066 & n. 5 (S.D.N.Y.1983). Moreover, because the predicate acts of mail fraud arise out of a single scheme, it follows that they are sufficiently related as to purposes, victims, and methods of commission to constitute a pattern.

Since the predicate acts of mail fraud alone are sufficient to meet the pattern requirement, extended discussion of OAD's second contention is unnecessary. Suffice it to say that to the extent that Rubenstein's alleged misrepresentation to Tisdale comprises a predicate offense involving securities fraud, it is similar in purposes, results, and participants to the audit confirmation mailings and would thus form a pattern, when taken together with the predicate act of mail fraud.

### enterprise

OAD's third argument in support of its motion to dismiss the racketeering claims is that the plaintiffs have not adequately alleged a RICO enterprise to state a claim under 18 U.S.C. § 1962(b) and (c). The amended complaint alleges three enterprise configurations:

—that Rubenstein, OAD and Comark associated in fact as an enterprise (¶ 98)

—that Rubenstein and Comark, individually or in combination with each other or with OAD, constituted an enterprise (¶ 99)

—that the Board Room Project constituted an enterprise, and Rubenstein and OAD associated with that enterprise (¶ 100)

OAD argues first, that the enterprise must be distinguished from the persons conducting the enterprise and thus that the defendants (by which OAD apparently means Rubenstein as well as OAD) cannot be named as the enterprise, and second, that the Board Room Project, by virtue of its licit purposes, lacked the required nexus with the alleged fraud.

 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." OAD's contention that the same person or entity cannot be cast both as the enterprise and as the "person" (defined in § 1961(3) as any individual or entity) who conducts or owns an interest in the enterprise is in accord with the position of the majority of circuits that have considered the question. *Accord Bennett v. United States Trust Company*, 770 F.2d 308, 315 (2d Cir.1985) (citing cases). Thus, at the very least, OAD cannot be the enterprise in this case. However, a group of entities—in this case, two partnerships and an individual—may constitute a "group of individuals associated in fact" within the meaning of Section 1961(4). *United States v. Huber*, 603 F.2d 387, 393–94 (2d Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980) (criminal RICO). As this court stated recently, "an association in fact which constitutes a RICO enterprise is not merely the synonym for the collective of 'individuals' which form the association, but instead, it is a distinct entity." *Fustok v. ContiCommodity Services, Inc.*, 618 F.Supp. 1074, 1076 (S.D.N.Y.1985). Consequently, the amended complaint at paragraph 98 and paragraph 99, to the extent it alleges an association in fact composed of Rubenstein, Comark and OAD, or any two of them, adequately alleges a RICO enterprise.

 OAD's argument that the Board Room Project's salutory purpose precludes it from constituting an enterprise is not persuasive. OAD cites no legal basis for its position and apparently relies upon the fact that the amended complaint contains no allegations that the Board Room Project was formed for a fraudulent purpose. However, this reasoning ignores the possibility that a legitimate enterprise may be used for a pattern of racketeering activity by a person employed by or associated with the enterprise. *See* 18 U.S.C. § 1962(c). Moreover, the plaintiffs have sufficiently alleged in the amended complaint a relationship between the predicate offenses and the activities of the Board Room Project. *See United States v. Scotto*, 641 F.2d 47, 54 (2d Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981).

### *conspiracy*

 OAD's final argument relating to the racketeering claims is that the plaintiffs have not adequately alleged a conspiracy to violate the RICO statute under Section 1962(d). The question of what constitutes a sufficient allegation of an agreement for the purposes of a conspiracy claim was discussed above in the context of common law conspiracy. The conclusion remains the same that the plaintiffs have pleaded sufficient facts from which an agreement to violate the RICO statute may be inferred. *See Rich-Taubman Associates v. Stamford Restaurant Operating Co., Inc.*, 587 F.Supp. 875, 879 n. 5 (S.D.N.Y.1984).

Accordingly, the motion to dismiss the racketeering claims is denied.

### F. *Punitive Damages*

Two of the plaintiffs, First Federal Savings and Loan Association of Pittsburgh ("First Federal") and the Federal Savings

and Loan Insurance Corporation ("FSLIC"), are either a successor in interest or an assignee of the interests of three savings and loan associations which actually had the dealings with Comark and OAD upon which this action is based.[16] OAD contends that First Federal and FSLIC cannot as a matter of law seek punitive damages on the claims alleged in the amended complaint.

 New York permits the assignment of essentially all tort claims other than those involving recovery for personal injury. *DiLallo v. Fidelity and Casualty Company*, 355 F.Supp. 519, 522–23 (S.D.N.Y.1973) (citing New York cases involving claims for conversion, fraud and deceit); *see* N.Y.Gen.Oblig.L. § 13–101 (McKinney 1978). Once a cause of action is determined to be assignable, a punitive damage claim based on the cause of action may also be brought by the assignee. *See Oppel v. Empire Mutual Insurance Company*, 517 F.Supp. 1305, 1307 (S.D.N.Y.1981) (Weinfeld, J.).[17]

 There is also some authority with respect to the claims assigned to FSLIC that federal law governs the assignability of liquidated institutions' claims, notwithstanding the state rule. *See Federal Savings and Loan Insurance Corporation v. Fielding*, 309 F.Supp. 1146, 1151 (D.Nev. 1969) (applying federal law and holding tort claims assignable though state law might

not allow it; "Federal courts must fashion federal law to further the purposes of the National Housing Act and to give effect to the regulatory scheme."), *cert. denied*, 400 U.S. 1009, 91 S.Ct. 567, 27 L.Ed.2d 621 (1971); *cf. Federal Deposit Insurance Corporation v. Abraham*, 439 F.Supp. 1150, 1152 (E.D.La.1977) (involving FDIC). In addition, 12 U.S.C. § 1729(d) (1982) provides:

> In connection with the liquidation of insured institutions, the [FSLIC] shall have power to carry on the business of and to collect all obligations to the insured institutions, to settle, compromise, or release claims in favor of or against the insured institutions....

*Id.* Thus, whether as a matter of New York or federal law, it would appear that claims for punitive damages may be brought by FSLIC as an assignee in this action.

Accordingly, OAD's motion to dismiss the punitive damage claims as to First Federal and FSLIC are denied.

\*　　\*　　\*

The motion to dismiss the amended complaint is therefore granted as to counts III, V, and IX of the amended complaint, granted as to material contained in paragraph 58 of the amended complaint for failure to state a claim for fraudulent misrepresenta-

---

**16.** *See supra* note 1.

**17.** OAD cites the law of California in support of its position without explaining why the law of that jurisdiction should apply to this question. The general rule in California appears to be that causes of action of a personal nature, such as injuries arising out of a tort, are not assignable. *Board of Trade of San Francisco v. Swiss Credit Bank*, 728 F.2d 1241, 1242–43 (9th Cir.1984) (applying California law); *Murphy v. Allstate Insurance Co.*, 17 Cal.3d 937, 942, 132 Cal.Rptr. 424, 427, 553 P.2d 584, 587 (1976) (placing punitive damages in nonassignable category); *see Dugar v. Happy Tiger Records, Inc.*, 41 Cal. App.3d 811, 819, 116 Cal.Rptr. 412, 417 (Ct. App.2d Dist.1974) (punitive damages allowed only to immediate person injured). However, an exhaustive treatment of the issue by an intermediate appellate court in *Goodley v. Wank and Wank, Inc.*, 62 Cal.App.3d 389, 133 Cal.Reptr. 83 (Ct.App.2d Dist.1976), reveals that California

courts have held assignable claims relating to conversion as well as a fraudulent sale of stock and a fraudulent conveyance, *id.* at 394 n. 9, 133 Cal.Rptr. at 85 n. 9, and have distinguished the assignment of a "bare right to complain of fraud" from an assignment of a claim to the moneys or property so obtained by fraud, *id.* at 398 & n. 12, 133 Cal.Rptr. at 87 & n. 12. *See also Osuna v. Albertson*, 134 Cal.App.3d 71, 80–83, 184 Cal.Rptr. 338, 343–45 (Ct.App.2d Dist. 1982). What the result would be of applying the California rule to the punitive damage claims asserted by First Federal and FSLIC is not free from doubt since the underlying cause of action in the case at hand involves the tort of fraud but states a claim for a definite amount of lost property. In any event, we have been presented with no reason why the law of California should govern this matter and we do not feel obliged to undertake a lengthy investigation into the question. *Cf. Lehman v. Dow Jones & Co.*, 783 F.2d 285 at 294 (2d Cir.1986).

tion, and granted without prejudice to re-pleading within 15 days of the filing of this Memorandum as to the allegations of wire fraud contained in paragraph 97 of the amended complaint. In all other respects the motion is denied.

It is so ordered.